ERNEST C. WENTCHER, Plaintiff-Appellant, *v.* HOWARD A. BUSBY *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 80-975

. Opinion filed July 15, 1981.

Arnstein, Gluck, Weitzenfeld & Minow, of Chicago (Arthur L. Klein and Leo F. Arnstein, of counsel), for appellant.

Rudnick & Wolf, of Chicago (Jay A. Canel and Vicki A. Thompson, of counsel), for appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Ernest C. Wentcher, brought this action against defendants, Howard A. Busby (Busby), Stanford L. Busby, and American National Bank & Trust Co. of Chicago, as trustee, seeking specific performance of an option contract to purchase certain real estate. At the close of plaintiff's case, the trial court entered judgment in favor of defendants. (Ill. Rev. Stat. 1979, ch. 110, par. 64(3).) Plaintiff appeals.

In his amended complaint, plaintiff alleged that by an agreement dated October 18, 1976, Busby, as agent for owners of a tract of realty known as Long Meadows, granted him an option to purchase the subject parcel; that he exercised the option on April 16, 1977; that Busby acknowledged and accepted his exercise of the option on May 20, 1977;

that Busby purported to terminate the option in June 1977; and that he was at all times a ready, willing and able buyer. Defendants' answer stated that Busby had entered into an agreement entitled "Option with Contract to Purchase" but denied that Wentcher had properly exercised the option.

Wentcher presented the following pertinent facts at trial. He is engaged in the sale of real estate investment properties. Busby was an owner of two parcels of real estate, known as Woodview and Long Meadows, located in Burr Ridge, Illinois. In June 1976, Wentcher and Busby entered into negotiations concerning the acquisition of these properties. Wentcher advised Busby that he did not wish to purchase one parcel without having the opportunity to acquire the other; he was prepared to buy Woodview but wanted an option to purchase Long Meadows. On July 15, 1976, the parties entered into an agreement pursuant to which Busby promised not to sell Long Meadows for 90 days. From July through October 1976, Wentcher, who planned to resell Long Meadows, undertook engineering studies to determine the property's suitability for development and contacted village officials in an effort to reinstate more favorable zoning regulations.

On October 18, 1976, the Woodview sale was closed. At the closing, Wentcher and Busby executed an option agreement for the purchase of Long Meadows which read, in relevant part:

"Optioner [Busby] does hereby grant to Optionee [Wentcher] the exclusive right and option, effective for ninety (90) days from the date hereof, *or such extended option period as hereinafter provided* (Hereinafter referred to as 'Option Period'), to purchase the Property and all rights therein.

\* \* \*

This Option may be exercised at any time within the Option Period by Optionee notifying Optionor. Upon giving such notice, this instrument shall constitute a contract of purchase, whereby Optionor covenants to sell and convey said real estate, and Optionee agrees to purchase same, subject to proof of good title and to the terms and conditions set forth in the Real Estate Sales Agreement set forth in Rider C herein."

A separate paragraph of the option agreement provided:

"Upon exercise of the Option in accordance with the above paragraph, Optionor and Optionee shall execute the Real Estate Sales Agreement which is attached hereto as Rider C."

The agreement further provided that the option could be extended for an additional period up to 90 days upon the optionee's payment of $2,000 for each 30-day extension.

At the time the option was executed, exhibits referred to in the option, including Rider C, had not yet been prepared. Roger Brejcha,

Wentcher's counsel, and William Zolla, Busby's counsel, who were responsible for drafting these exhibits, agreed that the documents to be used in the Long Meadows transaction would be similar to those employed in the Woodview purchase. By the end of November 1976, all of the exhibits to the option had been prepared and were initialled by Wentcher and Busby. Rider C, the Real Estate Sales Agreement, authorized amendment from time to time by written instrument executed by both parties.

By agreement of the parties, the option period which was to expire on January 18, 1977, was extended 30 days. At Wentcher's request, Busby did not require him to pay $2,000 for the extension. Thereafter, Wentcher requested and was granted, again without payment, a 61-day extension of the option period. Busby informed Wentcher, however, that he would have to exercise the option by April 18, 1977, which was several days prior to the village election involving the zoning issue.

By letters dated April 16 and 18, 1977, and telegrams of April 18, 1977, Wentcher transmitted the following message to Busby:

"I agree to exercise the option on property known as Long-meadow pursuant to our letter agreement dated July 15, 1976, as amended by option agreement dated October 18, 1976, and as extended by subsequent telegram between us. I will contact Zolla regarding contract referred to in October 18, 1976, agreement but never provided by Zolla. Will establish escrow at [Chicago Title & Trust] for initial payment on purchase pursuant to July 15, 1976, agreement subject to report of clear title."

Wentcher instructed Brejcha to prepare the requisite documents in accordance with the option agreement and Rider C. In a letter dated May 20, 1977, Zolla responded:

"[Busby] has furnished us with your letter of April 16, 1977, in which you exercised your option to purchase the [Long Meadows] property pursuant to letter agreement dated July 15, 1976, as incorporated in Option with Contract to Purchase dated October 18, 1976. On behalf of the Optionor under the Option with Contract to Purchase and the Seller under the Real Estate Sales Agreement, which latter document became effective upon the exercise of the option and sets forth the terms and conditions for the closing of the purchase and sale of said property, please be advised that the closing shall occur within thirty (30) days of the date hereof, as provided in Paragraph 5 of the said Real Estate Sales Agreement.

We will, therefore, expect to hear from you promptly with respect to setting a firm closing for a date on or before June 19, 1977."

Thereafter, Wentcher and Busby discussed certain modifications or

clarifications of Rider C regarding a partial release formula, a new survey of the acreage, and a three-way trade agreement. On June 1, 1977, Busby telephoned Brejcha asking where Rider C was, and Brejcha responded that he was preparing the documents and would forward them shortly. Brejcha noted, however, that the documents would contain certain changes clarifying the partial release formula and including a statement regarding a possible three-way trade agreement. Busby replied, "Just send them out."

When Brejcha undertook to redraft Rider C to incorporate these changes, he discovered that he did not have a copy of the original initialled document. Brejcha testified that although Zolla's letter of May 5, 1977, indicated that the Long Meadows contract documents were enclosed, none were actually sent. Brejcha testified that he requested these missing documents on April 16 and 18, 1977, and again in mid-May. Yet he also stated that after receiving the May 5 letter, he did not inform Zolla that the documents had not been received. Lacking the initialled Rider C, Brejcha prepared the revised version from a working draft of an agreement found in the Long Meadows file which had language similar to the Woodview contract. Brejcha mistakenly believed that the form used as a model was a final draft of the initialled Rider C. At trial, Brejcha stated that the model differed from the initialled Rider C but that he did not learn of this fact until actual receipt of the original Rider C on June 9, 1977.

On June 1, 1977, Brejcha sent Busby a copy of the agreement he had drafted. On June 3, 1977, Wentcher sent executed copies of this agreement to Busby and advised him to return the copies to Brejcha if they met with his approval. Brejcha's revised agreement differed from the initialled Rider C in several respects. The revised agreement decreased the acreage, thereby reducing the purchase price; eliminated purchase price guarantee and permitted exception provisions; and deleted the clause indicating that the seller would furnish a title insurance policy at the buyer's expense.

Wentcher testified that one week later, Busby telephoned him and expressed dissatisfaction with some provisions of the document sent by Wentcher. When Wentcher agreed to revert to the original Rider C without any revision, Busby was satisfied. Wentcher then instructed Brejcha to close pursuant to the original Rider C. In a letter to Brejcha dated June 7, 1977, Zolla stated that the option provided that upon exercise the sale would be closed in accordance with the documentation agreed upon and initialled concurrently with the execution of the option agreement. The real estate sales agreement furnished by Wentcher differed substantially from that agreed upon and hence was "unacceptable as a method of closing the subject transaction." The initialled

exhibits, including Rider C, were enclosed with the letter. Following further discussions between counsel concerning the partial release and three-way trade agreement, Zolla called Brejcha on June 15, 1977, and insisted that the sale be closed in accordance with the initialled Rider C.

On June 15, 1977, Brejcha drafted a letter of direction to the land trustee bank which was to take title to the property instructing it to execute the trust deed, mortgage, note and Rider C. Brejcha sent the documents first to Wentcher for his signature. On June 16, 1977, Brejcha received from Wentcher the executed Rider C and the earnest money, two checks totalling $60,000. The next day, Brejcha forwarded Rider C to the bank.

In a telephone conversation on June 17, 1977, Brejcha informed Zolla that Rider C had been submitted to the bank and that he had received the earnest money. Brejcha also requested Zolla to locate the original trust deed and note. When asked whether he had prepared the closing documents, Zolla responded that he had not yet completed his preparation for closing. On June 21, 1977, Brejcha called Zolla and informed him that Rider C was being executed by the bank and that he would receive the executed document shortly. Zolla replied, "Fine. Send them over." Zolla indicated that he had not yet found the original trust deed and note and promised to notify Brejcha after checking further regarding the documents.

The executed Rider C was delivered to Brejcha's office on June 22, 1977. The next day, at approximately 2:30 p.m., Brejcha sent the executed document to Zolla by messenger. Accompanying the rider was a letter asking Zolla to forward copies of the closing documents so that the transaction could be closed as soon as possible. At 3 p.m. that same afternoon, Brejcha dictated a letter to Zolla outlining his scheduling problems with respect to the anticipated closing and enclosing another copy of executed Rider C. Later, at 4:30 p.m., Brejcha telephoned Zolla and told him the documents were on their way. At that time, Zolla informed Brejcha that Busby had decided not to go through with the deal. A letter from Zolla dated June 23, 1977, confirming this termination of the option charged that Wentcher had failed to tender a fully executed real estate agreement in the form agreed upon by the parties, submitting instead a materially altered form, and that Wentcher had failed to take any action consistent with closing the purchase even though he had been notified that he was required to close on or before June 19, 1977.

In July 1977, Brejcha arranged to open an escrow. Wentcher's checks were never negotiated; they were retained by Brejcha. Wentcher testified that, both then and at the present time, he was ready, willing, and able to purchase Long Meadows in accordance with the terms of the original agreement.

At the close of Wentcher's case, defendants moved for judgment in their favor pursuant to section 64(3) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 64(3)). On March 7, 1980, after considering the evidence, the trial court granted defendants' motion. In so ruling, the court concluded that, as a matter of law, to accept the offer set forth in the option, Wentcher had to notify Busby in a timely manner of his decision to exercise the option and to tender a copy of the executed Rider C. The court expressly found that Wentcher was at all times ready, willing and able to purchase Long Meadows in accordance with the parties' agreement; that Wentcher's letter of April 16, 1977, showed timely exercise of the option; that the clarification of Rider C constituted a counteroffer rather than an acceptance; that by agreement of the parties the original offer was reinstated on June 10, 1977; that Wentcher did not submit an executed Rider C on or before June 19, 1977, the closing date fixed by Zolla's letter of May 20, 1977; and that Wentcher tendered the executed Rider C only after receiving notification of Busby's termination.

On appeal Wentcher initially contends that the trial court erred in concluding that, as a matter of law, in order to accept Busby's offer to purchase Long Meadows, Wentcher was required both to notify Busby in a timely manner of his decision to exercise the option and to tender a copy of the executed Rider C.

■■■ Where one party gives an option to another party, the acceptance, to be valid, so as to conclude a contract between the parties, must in every respect meet and correspond with the proposed terms of the offer. (*Morris v. Goldthorp* (1945), 390 Ill. 186, 60 N.E.2d 857; *Seaberg v. American National Bank & Trust Co.* (1976), 35 Ill. App. 3d 1065, 342 N.E.2d 751.) A purported acceptance which changes the terms of the option or varies, alters or adds conditions to the offer constitutes a counteroffer rather than an acceptance. (*Farley v. Roosevelt Memorial Hospital* (1978), 67 Ill. App. 3d 700, 384 N.E.2d 1352; see *Department of Public Works & Buildings v. Halls* (1966), 35 Ill. 2d 283, 220 N.E.2d 167.) Wentcher urges that his written notice of exercise of the option on April 16, 1977, was sufficient in itself to create a binding contract of purchase. The position advanced by defendants is that a valid exercise of the option required tender of an executed Rider C, in addition to notice of exercise, and that the revised real estate agreement submitted by Wentcher which varied in material respects from the original agreement constituted a counteroffer.

This court considered a similar issue and factual situation in *Farley v. Roosevelt Memorial Hospital*. There, the option to purchase property on the terms contained in an attached sales contract provided that to exercise the option, the optionee was required to send written notice of the exercise to the optionor prior to the expiration date. A separate paragraph

provided that if exercised, the parties would "immediately" sign the real estate contract attached to the option, "Exhibit 1." The optionee transmitted timely notice of exercise but, by mistake, his attorney's associate who had no prior involvement in the transaction enclosed signed copies of an incorrect contract which had been found in the file. The incorrect contract forwarded to the optionor varied in material respects from the form attached to the option agreement. The optionor deemed the purported acceptance to be a counteroffer. On review of a preliminary injunction prohibiting the sale of the property to a third party, we found that the operative feature of the offer contained in the option agreement was the giving of notice that the buyer exercised the option, and that the execution of Exhibit 1 was neither necessary to complete the transaction nor to bind the parties to its terms. The option agreement incorporated, without the need to refer to an executed Exhibit 1, the complete terms and conditions of the sale. We reasoned that the agreement to purchase became operative upon exercise of the option; the requirement of execution of the real estate sales contract added nothing material to the transaction because the parties had already expressed approval and acceptance of its terms when they signed the option agreement and sent notice of exercise. The act of executing the contract was regarded by the court as a "ministerial act" or as a matter pertaining to the performance of the contract rather than its creation. We concluded that upon the optionee's notice to the optionor that he exercised the option, an enforceable contract arose upon the terms and conditions fixed in Exhibit 1. We further held that in forwarding the incorrect contract with the notice of exercise, the optionee did not alter his acceptance of the terms contained in Exhibit 1. The enclosure of the wrong draft of the contract was of no significance because it was signed and forwarded as a result of confusion and mistake. If the optionee could establish that he did not intentionally enclose the wrong form, he could not be charged with oppression and fraud and would have a reasonable likelihood of establishing that his exercise was valid.

Similarly, in *Welsh v. Jakstas* (1948), 401 Ill. 288, 82 N.E.2d 53, the option agreement provided that the option was to be exercised upon written notice and added in a separate paragraph that upon such exercise, the purchaser "shall immediately pay" the seller the initial installment of the purchase price. In construing the agreement, our supreme court concluded that nothing in the option required payment to be tendered when the option right was exercised in order to constitute an acceptance; acceptance in writing was the only thing necessary. Payment was a matter relating to the performance rather than the creation of the contract.

■■ We believe the *Farley* and *Welsh* decisions are controlling in the present case. The option agreement before us expressly provides that the

option is to be exercised by giving notice to the optionor, and that upon such notice, the option agreement would constitute a contract of purchase subject to the terms and conditions set forth in the sales contract attached as Rider C. Thus, the operative feature contained in the option agreement was Wentcher's notice of exercise to Busby. In the letters and telegrams transmitted to Busby on April 16 and 18, 1977, Wentcher stated, "I agree to exercise the option * * * pursuant to our letter agreement dated July 15, 1976, as amended by option agreement dated October 18, 1976, * * *." We perceive this language to evince a specific, certain and unconditional acceptance of the offer contained in the option. (See *Kadansky v. Fickett* (1973), 54 Ill. 2d 14, 294 N.E.2d 262; *Gaskins v. Walz* (1951), 409 Ill. 40, 97 N.E.2d 798; *Dodds v. Giachini* (1979), 79 Ill. App. 3d 358, 398 N.E.2d 205.) The additional language concerning the escrow and report of clear title does not assert new demands or conditions or make the acceptance equivocal.

Furthermore, as in *Farley*, the option agreement did not require that Rider C be executed as a condition precedent to acceptance of the option or that it be executed concurrently with exercise of the option. A clause in the agreement provided only that upon exercise of the option in accordance with an earlier paragraph, the parties "shall execute" Rider C. In this preceding paragraph, the giving of notice was the only act necessary for exercise of the option.

Moreover, the parties acknowledge in their option that upon giving notice of exercise, the instrument will constitute a contract of purchase subject to the terms and conditions set forth in the attached Rider C. Thus, even without reference to an executed Rider C, the terms and conditions of the sale can be ascertained from the option agreement. Defendants point out, however, that although the option incorporates Rider C, the rider had not been drafted at the time the option was executed. This fact is not dispositive inasmuch as Rider C had been prepared, initialled, and attached to the option prior to Wentcher's notice of exercise. The parties already having bound themselves to the terms of Rider C by signing the option and sending the notification of exercise, the subsequent execution of the document would add nothing material to the transaction. We thus view the execution of Rider C as a matter pertaining to contract performance rather than formation.

We believe that Wentcher's notice of April 16, 1977, constituted a timely, effective exercise of the option and gave rise to a binding contract of purchase. (*Bonde v. Weber* (1955), 6 Ill. 2d 365, 128 N.E.2d 883.) Our conclusion is strengthened by the fact that the parties regarded Wentcher's letter as a valid exercise of that option. In a letter dated May 20, 1977, Zolla acknowledged receipt of the letter of April 16, 1977, in which Wentcher "exercised the option." Zolla further stated that the sales

agreement, Rider C, which became effective upon the exercise of the option, set forth the terms and conditions for closing the purchase. Zolla's letter recognizes the validity of the exercise.

■■ Finally, in forwarding the revised real estate sales agreement to Busby subsequent to and separate from his notice of exercise, Wentcher did not condition or qualify his earlier acceptance of the offer to purchase Long Meadows on the terms contained in Rider C. Upon written acceptance of the option, a binding contract of purchase was established in accordance with the terms of Rider C. The revised draft merely proposed modifications; such modifications were explicitly authorized by Rider C. As an enforceable contract had already been formed upon the notice of exercise, the revised draft was not a counteroffer.

In any event, as in *Farley*, the wrong form of the agreement was submitted by mistake and without knowledge that it varied materially from the initialled Rider C. After learning of the existence of these disparities and of Busby's dissatisfaction with the changes, the parties agreed to reinstate the original Rider C. The record is devoid of facts suggesting that Brejcha or Wentcher intentionally submitted the wrong form so as to be charged with fraud or oppression. We therefore conclude that Wentcher effectively exercised the option to purchase Long Meadows.

Defendants urge, however, that even if the parties had a contract based on Rider C, Wentcher breached that contract by not meeting his obligation to close the transaction on or before June 19, 1977.

The trial court found that Zolla's letter of May 20, 1977, fixed June 19 as the closing date for the transaction. From the evidence presented by Wentcher, we believe this finding is erroneous. The letter advised that the closing would occur within 30 days as provided in paragraph 5 of Rider C, and continued, "We will, therefore, expect to hear from you promptly with respect to setting a firm closing for a date on or before June 19, 1977." June 19, 1977, was a Sunday. We believe this correspondence set forth a projected time frame for the anticipated closing rather than fix a firm date. And defendants did not give notice of a closing date to the trustee bank as required by Rider C. Moreover, the comments of Zolla on June 21, 1977, suggest that Busby may have waived strict compliance with such purported closing date. (See *Kitsos v. Terry's Chrysler-Plymouth, Inc.* (1979), 70 Ill. App. 3d 728, 388 N.E.2d 1054; *Dunn v. Hoefer* (1972), 5 Ill. App. 3d 793, 284 N.E.2d 1.) On that day, when Brejcha informed Zolla that the executed Rider C would be forwarded soon, Zolla remarked, "Fine. Send them over." And on June 17 and 21, 1977, Zolla told Brejcha that he had not completed the documents necessary for closing.

■■ Our supreme court, in *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43, has outlined the procedure to be followed in ruling on a

section 64(3) motion for judgment at the close of plaintiff's case. The trial judge must first determine whether the plaintiff has made out a *prima facie* case. If he has not, the court should grant the motion and enter judgment in favor of defendant. If plaintiff has presented a *prima facie* case, the court then weighs all the evidence, considering the weight and quality of the evidence and the credibility of witnesses and drawing reasonable inferences from the testimony. If, after this weighing process, sufficient evidence to establish a *prima facie* case remains, the court should deny the motion and proceed as if the motion had not been made. On review, the trial court's decision should not be disturbed unless contrary to the manifest weight of the evidence. *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 349 N.E.2d 399.

■■ Specific performance is not a matter of right, but rather rests within the sound discretion of the trial court to be determined from all the facts and circumstances in evidence. (*Harper v. Kennedy* (1958), 15 Ill. 2d 46, 153 N.E.2d 801; *Wolford v. James E. Kolls Investment Co.* (1978), 61 Ill. App. 3d 405, 377 N.E.2d 1314.) To support a judgment for specific performance, the evidence must be clear, explicit and convincing, and the party seeking such relief must demonstrate that he has always been ready, willing and able to perform the contract. *Wolford v. James E. Kolls Investment Co.*

■■ We believe the trial court's decision to grant defendants' motion for judgment at the close of Wentcher's case was contrary to the manifest weight of the evidence. Apparently Wentcher was at all times ready, willing and able to purchase Long Meadows in accordance with the terms of the agreement. He gave timely and proper notification to Busby that he was exercising the option. And the essential terms and conditions of the sale were ascertainable from the real estate sales agreement, Rider C, which was incorporated into the option agreement. The evidence adduced by Wentcher was ample to withstand defendant's motion. The trial should proceed as if no judgment had been entered to enable the trial court to decide the case on the totality of the evidence presented.

For the aforementioned reasons, the judgment of the circuit court of Cook County entering judgment in favor of defendants is reversed and the cause is remanded for further proceedings.

Reversed and remanded.

McGILLICUDDY and WHITE, JJ., concur.