BRUCE H. DODDS *et al.*, Plaintiffs and Counterdefendants-Appellees, *v.* PETER D. GIACHINI, Defendant and Counterclaimant-Appellant.

First District (5th Division)    No. 78-1231

Opinion filed November 30, 1979.—Rehearing denied January 11, 1980.

William J. Harte, Ltd., of Chicago, for appellant.

Roger G. Fein, Malcolm S. Kamin, and Donald I. Resnick, all of Arvey, Hodes, Costello & Burman, of Chicago, for appellees.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Plaintiffs brought an action to cancel an agreement which granted defendant an unrestricted option to purchase their stock in Tollway Arlington National Bank (TANB). They also sought injunctive relief to prevent him from transferring into his name the stock, which he held as collateral for a loan made by him to them. Defendant filed a counterclaim for specific performance of the option agreement. In denying defendant's claim for specific performance, the trial court ruled that the option agreement was null and void, because (a) defendant's attempted exercise of his option was ineffective, and (b) defendant failed to tender payment for the stock before the allotted time expired. In addition, the trial court ruled that specific performance was unavailable because the option agreement was vague on material terms and mutuality of remedy was not present. Defendant appeals from that order.

At trial, the evidence consisted of a stipulation of facts, exhibits, and the testimony of defendant. A summary follows.

Plaintiffs owned more than 51% of the outstanding shares of TANB on May 7, 1976. They also owned the beneficial interest in a land trust which held title to the real estate and building in which TANB was located. On May 10, 1976, the parties entered into an agreement dated May 7, 1976, whereby defendant loaned them $450,000 for a period of eight months at 8¾% interest per year. As collateral, plaintiffs deposited 51% of the common stock of TANB with defendant, and defendant received an unrestricted option to purchase from them 1,583 shares of TANB at $300 per share to be exercised within eight months of May 10. The exact language of the agreement granting the option follows:

> "Sellers represent that they own or control 1583 shares representing approximately 53% of the outstanding stock of said Bank and hereby grant to Purchaser an unrestricted option to purchase such shares at $300 per share. The option shall be effective on this date and shall remain effective for a period of 8 months, from the date hereof and in the event that the option is not exercised, then the stock pledged as collateral will be returned to Sellers upon payment by Sellers of the then outstanding loan balance."

The agreement further provided that upon exercise of the option: plaintiffs would grant TANB a five-year lease at $5100 per month or at a rental acceptable to comptroller of the currency; defendant would purchase the remaining shares of TANB stock at $300 per share if plaintiffs so desired; plaintiffs would repurchase any loans made by TANB which were in default or listed as "Substandard"; and defendant

could use the principal and interest on the loan as part of the purchase price. As of May 10, 1976, TANB occupied all of the first floor and a portion of the basement of the building owned by plaintiffs, and the rent was $5,100 per month.

From May 10, 1976, to December 9, 1976, the parties engaged in a series of meetings and correspondence to negotiate the terms of the lease referred to in the May 10 agreement. However, these negotiations failed to produce a lease agreement.

A letter dated December 9, 1976, from defendant to plaintiffs, attempted to exercise the stock option: "* * * I hereby serve notice of exercise of option to purchase the controlling shares in Tollway Arlington National Bank under the terms of our agreement dated May 7, 1976." It further stated what defendant considered to be the terms of the May 10 agreement. Specifically, the letter stated the rent should be $4,000 per month consistent with the request of the comptroller of currency; rental for the renewal periods of the lease would be arrived at by the agreement of the parties or by arbitration; any additional shares that defendant would be required to buy should be made available to him within the next 30 days; and plaintiffs would be required to repurchase all loans listed as "doubtful" or "loss" by the comptroller of currency. Each of these explanatory statements was prefaced by the qualification as being consistent with the May 10, 1976, agreement.

Additional negotiations took place between December 9, 1976, and April 13, 1977. They involved the details of the proposed lease and plaintiffs' obligation to repurchase substandard loans of TANB. Both sides expressed an interest in expediting an amicable closing of the deal. Consistent with this interest, defendant indicated his willingness to fulfill his part of the agreement in his letters of February 4, March 2, March 9 and April 4, 1977. At no time during this period did the plaintiffs contend that defendant's letter of December 9, 1976, was ineffective as an exercise of his option, or request tender of the purchase price of the stock, or assert that the May 10 agreement was unenforceable. On the contrary, on February 24, 1977, plaintiffs transferred 10 shares of TANB stock to defendant and then elected him to the board of directors.

From the time of the May 10, 1976, agreement to January 1, 1977, TANB occupied the first floor and part of the basement of the building owned by plaintiffs. This arrangement was maintained under an informal lease agreement between them and TANB. In January 1977 plaintiffs and TANB negotiated and executed a formal lease which reduced the amount of space to be occupied by TANB. Although this lease was executed after defendant's purported exercise of his option to become the majority shareholder of TANB, he stated that he was not informed of the execution of the lease. On April 13, 1977, a letter sent to defendant by plaintiffs

mentioned briefly and for the first time possible questions as to the enforceability of the May 10 agreement.

On September 20, 1977, plaintiffs tendered a cashier's check in the amount of $514,008 to defendant as payment of their loan and the interest. He refused to accept the tender and three days later, directed TANB to transfer title to the remaining 1,548 shares into his name. In response, plaintiffs instituted this action for injunctive relief.

OPINION

On appeal defendant contends that he effectively exercised his option on December 9, 1976, and is therefore entitled to specific performance of the May 10 agreement. The trial court ruled that his purported acceptance of the option was conditional and therefore, not an effective exercise of the option, but a counteroffer. Thus, the first issue is whether defendant's letter of December 9 was an effective exercise of his option. We hold that it was.

■■■ The exercise of an option to be effective must be an unconditional acceptance of each and every term of the option agreement without adding new terms. (*Morris v. Goldthorp* (1945), 390 Ill. 186, 60 N.E.2d 857.) Where the purported exercise of the option varies in any way the terms of the option agreement, the exercise is not effective. (*Bostwick v. Hess* (1875), 80 Ill. 138.) In *Gaskins v. Walz* (1951), 409 Ill. 40, 97 N.E.2d 798, the optionee attempted to exercise his option to purchase real estate in a letter to the optionor. The letter stated: "You are hereby notified that the option contained in said lease to purchase said property for the sum of $17,500 is hereby exercised." However, the optionee went on to demand the delivery of an abstract of title showing good and merchantable title. The option agreement did not require the seller to produce an abstract of title showing good and merchantable title. In determining whether the exercise of the option was conditional, the Illinois Supreme Court stated:

"It would seem that the sensible view is that for the demand to invalidate the acceptance it must amount to a qualification or a condition imposed as a part of the acceptance itself. Here there was no condition or qualification so imposed. The acceptance was specific, certain and unconditional. The demand for an abstract showing merchantable title was made in reference to what should happen as to performance during the period of the executory contract." (*Gaskins*, 409 Ill. 40, 45, 97 N.E.2d 798, 801. See, *Kadansky v. Fickett* (1973), 54 Ill. 2d 14, 294 N.E.2d 262.)

In determining whether defendant's December 9 letter was an unconditional acceptance of the terms of the option agreement, we note that the letter stated: "However, I hereby serve notice of exercise of option to purchase the controlling shares in Tollway Arlington National Bank

under the terms of our agreement dated May 7, 1976." This sentence is an unequivocal acceptance of the option on the terms of the May 10 agreement. Similar language has been upheld as an effective exercise of an option. *Kadansky; Gaskins.*

The remaining paragraphs of the letter are the author's attempt to state what steps must be taken in accordance with the option agreement to close this transaction. First, the option agreement provided that the rental must be acceptable to the comptroller of currency. Defendant's letter further stated that pursuant to his understanding of the comptroller's directions the rental would be $4,000 per month. This statement was merely an application of the terms of the option agreement and not a new term or condition. Second, the option agreement provided that renewal rental on the lease would be determined by the parties. In his letter, defendant restated this provision and added the use of arbitration if necessary. This was not a condition to the existence of a contract, but rather a suggestion as to the resolution of any future problems in the subsequent performance of the contract. Third, the option agreement obliged defendant, upon the exercise of his option, to purchase up to 100% of the TANB stock at $300 per share if plaintiffs so requested. In his letter, defendant agreed to fulfill this obligation, but requested that any stock plaintiffs wished him to purchase should be made available within 30 days. Again, this statement involves the manner of performance and not defendant's duty to perform. Defendant's request that additional shares be made available within a 30-day time frame was a reasonable step to ensure the full and imminent performance of his duties under the agreement. His obligation to purchase the stock was not altered. Fourth, the option agreement provided that upon exercise of the option plaintiffs would be obliged to repurchase any loans in default or listed as substandard by the comptroller of the currency. In his letter, defendant stated his expectation that plaintiffs will pursuant to the agreement purchase all loans listed as doubtful or loss. Defendant did not alter the terms of the option agreement, but merely employed his own words to define the Dodds' obligation under the agreement. Plaintiffs' duty to repurchase all loans listed in default or as substandard remains unchanged. Consequently, we find that the December 9 letter was an effective exercise of defendant's option.

■■ The next issue is whether defendant lost his right to bring an action for specific performance by failing to tender the purchase price to plaintiffs within the allotted eight months. Generally, a plaintiff seeking a judgment of specific performance of a contract must be ready and offer to pay any sum that may be due and to comply with the contract on his part. (*Kennedy v. Neil* (1929), 333 Ill. 629, 165 N.E. 148.) However, in an equity action the technical rules of tender are relaxed to prevent injustice,

and the question is whether the plaintiff has made a conscientious effort on his part to comply honestly with the contract. (*Macy v. Brown* (1927), 326 Ill. 556, 158 N.E. 216.) This is especially true where there is an unsettled account between the parties and, in such a case, it is sufficient for the plaintiff to show a willingness and ability to pay what may be found due upon an accounting. *Lewis v. McCreedy* (1941), 378 Ill. 264, 38 N.E.2d 170.

In the present case, defendant exercised his option to purchase the controlling shares of TANB on December 9, 1976. At that time, plaintiffs owed defendant the principal of the loan $450,000, plus the accumulated interest, $16,407 for a total debt of $466,407. The purchase price of 1,558 shares at $300 per share was $467,400. Under the option agreement, defendant had the right to apply the outstanding principal and accumulated interest on the loan to the purchase price. Thus, defendant owed plaintiffs $997 on the purchase of the shares.

■ Following defendant's exercise of his options, the parties engaged in a series of negotiations to finalize their deal. These negotiations present a clear picture of the efforts undertaken by defendant to close the deal. For example, on December 14, 1976, defendant mailed plaintiffs a letter stating in great detail his proposals for the lease. On January 31, 1977, defendant agreed to postpone the immediate closing of this transaction at plaintiffs' request. On February 4, 1977, defendant expressed his desire to close this deal and assume control of TANB. He was elected to the board of directors of TANB on February 24, 1977, in anticipation of his purchase of the controlling shares of TANB. These are but a few of defendant's conscientious efforts to comply with his obligations under the contract. Since defendant owed under $1000 on a total purchase price of over $400,000 and had made numerous sincere efforts to fulfill his duties under the agreement, we believe the requirement of tender has been satisfied. See *Lewis v. McCreedy* (1941), 378 Ill. 264, 38 N.E.2d 170 and *Macy v. Brown* (1927), 326 Ill. 556, 158 N.E. 216.

We now turn to the questions of whether specific performance is an available remedy in this case. First, plaintiffs maintain that the agreement is not specifically enforceable because they could not have forced TANB to enter into the lease because it was not a party to the option agreement. Generally, the remedy of specific performance of a contract is available only where the contract is binding and mutually enforceable as to all parties. (*Cohen v. Kosden* (1949), 402 Ill. 429, 84 N.E.2d 358.) However, mutuality of remedy need not be present at the inception of a contract. (*Gould v. Stelter* (1958), 14 Ill. 2d 376, 152 N.E.2d 869.) In short, plaintiffs are attempting to draw a distinction between TANB and defendant as owner of controlling shares of TANB. This argument was rejected in *Borg-Warner Corp. v. Anchor Coupling Co.* (1959), 16 Ill. 2d 234, 156

N.E.2d 513. In that case, the purchaser sued the majority shareholders of a corporation to obtain specific performance of a contract to sell the assets and property of the corporation. Defendants argued that the contract could not be specifically enforced because it did not purport to bind the corporation. The Illinois Supreme Court disagreed and held that the contract was specifically enforceable because the decree would require the majority shareholders to carry out the steps necessary to cause the corporation to transfer its assets and property. (*Anchor Coupling Co.*, 16 Ill. 2d 234, 244, 156 N.E.2d 513, 518.) Similarly, in the present case, a judgment of specific performance, if needed to protect plaintiffs' rights, would require defendant, the majority shareholder of TANB, to cause TANB to enter into the proposed lease. Accordingly, specific performance is not barred by a lack of mutuality.

The final issue is whether the May 10, 1976, agreement was so vague and uncertain as to the essential terms of the proposed lease as to bar a judgment of specific performance. According to the plaintiffs, the fatal flaw with regard to the proposed lease is the failure to expressly state what space will be rented by TANB. Equitable enforcement of a contract by a judgment of specific performance is proper only where the contract is clear, definite, and complete. (*Meredith v. Dailey* (1961), 29 Ill. App. 2d 255, 173 N.E.2d 586.) In a suit for specific performance, where the terms of the contract are indefinite or ambiguous on the face of the contract itself, the uncertainty cannot be cured by extrinsic evidence. (*Thomas v. Pope* (1942), 380 Ill. 206, 43 N.E.2d 1004.) Thus, the function of a court in a suit for specific performance is to enforce a contract as made by the parties and not to make a contract for them and then enforce the contract thus made. *White v. Lang* (1948), 401 Ill. 219, 81 N.E.2d 897.

■■■ In the present case, the May 10 agreement failed to specify what space was to be rented by TANB under the proposed lease. Illinois law requires four points of concrete agreement to create a valid contract of lease: (1) the extent and bounds of the property; (2) the term of the lease; (3) the amount of the rent; and (4) the time and manner of payment. (*Lannon v. Lamps* (1977), 53 Ill. App. 3d 145, 368 N.E.2d 196.) While we feel that extrinsic evidence would provide the space the parties intended for the lease, Illinois law prohibits the use of extrinsic evidence to cure indefiniteness in an action for specific performance. (*Pope.*) Consequently, a judgment of specific performance with regard to the lease cannot issue. Where specific performance of a whole contract is not possible, a court of equity may grant specific performance to the remainder of the contract which is capable of performance. (*Kuhn v. Sohns* (1926), 324 Ill. 48, 154 N.E. 401.) We find that the rest of the May 10 agreement is sufficiently certain and definite, and therefore a decree

of specific performance as to the remainder of the agreement should be entered.

Accordingly, the judgment of the circuit court of Cook County is reversed, and the cause remanded with directions to enter a judgment of specific performance in favor of the defendant consistent with the views expressed in this opinion.

Reversed and remanded.

MEJDA and WILSON, JJ., concur.