ERIC ROTHNER *et al.*, Plaintiffs-Appellants, v. HENRY MERMELSTEIN
*et al.*, Defendants-Appellees.

First District (4th Division) No. 1—90—2946

Opinion filed September 12, 1991.—Rehearing denied October 15, 1991.

Katz, Randall & Weinberg, of Chicago (Warren Lupel, of counsel), for appellants.

Torshen, Schoenfield & Spreyer, Ltd., and Albert Koretzky, both of Chicago (Jerome H. Torshen and Abigail K. Spreyer, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

Plaintiffs, Eric Rothner and Michael Giannini, brought an action in the circuit court of Cook County against defendants, Henry, Louise, and Marvin Mermelstein, and the La Salle National Bank as trustee under a land trust. Plaintiffs sought, *inter alia*, the specific performance of a stock purchase agreement, in which Rothner agreed to buy stock in the Mermelsteins' closely held corporation.

The trial court granted Louise Mermelstein's motion for summary judgment on the issue of specific performance. Plaintiffs appeal, contending that the trial court erred in granting summary judgment for Louise on the issue of specific performance.

We affirm the judgment of the trial court.

BACKGROUND

A

The record contains the following pertinent facts. Defendants Henry and Louise Mermelstein, their son Marvin, and another son who is not a defendant in this lawsuit are the shareholders in Central Home, Inc. This closely held corporation operates a nursing home in Chicago. The land upon which the nursing home stands is held in an Illinois land trust by the La Salle National Bank as trustee. Henry and Louise are the beneficiaries of the land trust.

On July 3, 1989, Central Home entered into a lease agreement with the trustee bank. Rothner signed for the tenant as president of Central Home, and Henry and Louise signed for the landlord as sole beneficiaries of the land trust. Under the 15-year lease, Rothner rented the nursing home facility and property from Henry and Louise. Rothner paid a security deposit of $500,000 and a monthly rent, from August 1989 to July 1990, of $93,151. The parties closed the lease in late July. Rothner operated the nursing home from August 1989 through March 1990.

On July 15, 1989, Rothner and Louise entered into a stock purchase agreement. Louise agreed to sell to Rothner 500 shares of Central Home stock, which constituted half of the total outstanding shares. The agreement provided in pertinent part:

"4. *Conditions Applicable to Buyer.* Buyer's obligation to complete the transaction provided for herein shall be subject to the performance by Seller of all of the conditions to be performed by her on or before the date of Closing, to the material accuracy and correctness of the representations and warranties of Seller contained herein.

5. *Conditions Applicable to the Seller.* Seller's obligation to complete the transaction provided for herein shall be subject to the performance by the Buyer of all of the conditions to be performed by them on or before the Closing and to the material accuracy and correctness of the representations and warranties of the Buyer.

6. *Purchase Price.* The purchase price payable to the Seller shall be *TWENTY TWO THOUSAND ($22,000.00)* DOLLARS. Subject to the conditions, representations and warranties hereof, the purchase price shall be paid at Closing.

7. *Closing.* The Closing shall be the same date and take place at the same location as Corporation's closing on its lease of the real estate and shall follow immediately thereafter. At the Closing, Seller shall deliver to buyer Certificate No. 5, representing the Common Shares, duly endorsed in blank for transfer.

\* \* \*

15. *Entire Agreement.* This Agreement contains all the terms agreed upon among the parties with respect to the subject matter hereof, and no modification or amendment of this Agreement shall be binding on any of the parties hereto unless in writing and signed by the parties to be bound thereby."

The July 3 lease did not refer to the July 15 stock purchase agreement.

B

On March 29, 1990, Rothner and Michael Giannini filed a seven-count complaint in the trial court against defendants. Giannini was the administrator of the nursing home that Central Home operates. Giannini alleged that he was a shareholder (14.5%) in Central Home by virtue of an agreement with Rothner. Plaintiffs attached to the complaint the lease and stock purchase agreement.

In count I of the complaint, plaintiffs sought the specific performance of the stock purchase agreement. Plaintiffs alleged as follows. Paragraph 7 of the stock purchase agreement required Louise to deliver the 500 shares of Central Home stock to Rothner on the date of closing on the lease. However, she failed to do so and had not yet delivered the stock. Louise had refused plaintiffs' demands for the stock. Lastly, "ROTHNER has performed each of the provisions applicable to him in Exhibit A [the stock purchase agreement] and has an absolute right to performance."

On April 10, 1990, Louise answered count I of the complaint, alleging as follows. Plaintiffs did not own any stock in Central Home. The stock purchase agreement was never closed, i.e., the agreement was never performed. Rothner breached the agreement by failing to pay the purchase price of $22,000 in July 1989 or at any other time. Since Rothner did not pay the purchase price, she was not required to deliver the stock.

On April 18, 1990, Louise moved for summary judgment on count I of the complaint. On April 25, she filed an affidavit in support of the motion. Louise alleged that count I was based on the stock purchase agreement, and that Rothner failed to pay for the stock in the manner required by the agreement. Further, Louise had not received any money whatever from Rothner for the stock. Since Rothner failed to perform the agreement, Louise was entitled to a summary judgment in her favor.

On May 22, 1990, plaintiffs responded to Louise's motion for summary judgment on count I. Plaintiffs attached to their motion an affidavit by Rothner and an affidavit by Lawrence Schwartz, Rothner's attorney. Plaintiffs asserted that although they performed their obligations under the agreement, Louise did not perform hers.

Plaintiffs alleged that the $22,000 was never intended to be paid. Rather, the parties agreed that the stock purchase agreement was intended merely "to avoid new licensing procedures by various State and local agencies." Further, "[a]lthough two agreements were in fact prepared, it was construed as a single transaction contemporaneously done and treated as such by the participants." Attorney Schwartz stated in his affidavit as follows:

> "8. It was understood that whatever figure was inserted in the Stock Purchase Agreement[, that amount] would be a part of the $500,000.00 paid pursuant to the lease transaction, or alternatively, would be offset at a subsequent time when prorations were accomplished. However, it was clearly understood that no monies would change hands beyond the $500,000.00,

plus or minus prorations. It was for that reason that the parties were unconcerned if the figure was $10.00 or $22,000.00, as it was merely a matter of allocation."

Plaintiffs concluded that the record contained genuine issues of material fact that precluded summary judgment.

On June 14, 1990, the trial court held a hearing on Louise's motion for summary judgment. At the close of the hearing, the trial court concluded that plaintiffs were not entitled to specific performance. The court found that the stock purchase agreement required Rothner to pay $22,000 for the stock. Further, it was undisputed that Rothner failed to do so. Thus, the court granted summary judgment for Louise on count I of the complaint.

On June 18, 1990, plaintiffs attached to the complaint an amendment to the July 3, 1989, lease. The lease amendment was dated July 21, 1989, but was signed by Rothner and Henry on August 22, 1989. Paragraph 5 of the lease amendment referred to Rothner's ownership of Central Home stock. The provision required Rothner to pledge his stock as collateral to secure his performance under the lease.

On July 10, 1990, plaintiffs filed a motion to reconsider the summary judgment for Louise on count I. (See Ill. Rev. Stat. 1989, ch. 110, par. 2—1203.) Attached to the motion was a "Supplemental Affidavit" by Rothner. In this second affidavit, Rothner essentially repeated his contention: although he did not pay Louise the $22,000 for the stock, no one intended that he do so.

On September 11, 1990, the trial court held a hearing on plaintiffs' motion for reconsideration. At the close of the hearing, the court denied the motion. Plaintiffs appeal.

OPINION

When a plaintiff appeals from a trial court's order of summary judgment for a defendant, the only issue on appeal is whether "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) A triable issue precluding summary judgment exists where there is a dispute as to material facts, or where reasonable persons might draw different inferences from the undisputed facts. *Susmano v. Associated Internists of Chicago, Ltd.* (1981), 97 Ill. App. 3d 215, 218-19, 422 N.E.2d 879, 882.

■■ ■ Plaintiffs contend that a genuine issue of material fact exists as to whether Rothner is entitled to specific performance of the

stock purchase agreement. Specific performance refers to the performance of the very (specific) thing called for by the contract. This equitable remedy stands in contrast to the payment of money as a substitute for performance. (D. Dobbs, Handbook on the Law of Remedies 795-96 (1973).) The remedy is based on the desire to do more perfect and complete justice, which the remedy at law would fail to give. (4 J. Pomeroy, Equity Jurisprudence §1401 (5th ed. 1941); accord 33A Ill. L. & Prac. *Specific Performance* §11 (1970).) The availability of specific performance of a contract for the sale of corporate stock depends upon the character of the stock. If the shares are readily obtainable in the open market, specific performance will be denied. However, if the shares have no market rating and cannot easily be obtained elsewhere, specific performance is available. *Smurr v. Kamen* (1921), 301 Ill. 179, 188, 133 N.E. 715, 719; 33A Ill. L. & Prac. *Specific Performance* §56 (1970).

 Specific performance is not available as a matter of right. Rather, the remedy rests in the sound discretion of the trial court, based on all of the facts and circumstances in evidence. The party seeking specific performance of a contract must show that he has performed his part of the agreement; or that he was ready, willing, and able to perform and was prevented from performing by the act of the other party. (*Beesley Realty & Mortgage Co. v. Busalachi* (1963), 28 Ill. 2d 162, 165, 190 N.E.2d 715, 716; *Wolford v. James E. Kolls Investment Co.* (1978), 61 Ill. App. 3d 405, 408-09, 377 N.E.2d 1314, 1317; 33A Ill. L. & Prac. *Specific Performance* §§85, 86 (1970).) Where the contract requires the buyer to pay money and the seller to deliver the object of the sale at a certain time, those covenants are mutual and dependent. Under such circumstances, neither party can compel the other to perform without first tendering the money or the item. *Miller v. Shea* (1921), 300 Ill. 180, 184-85, 133 N.E. 183, 185.

Applying these principles to the case at bar, we conclude that the trial court properly granted summary judgment for Louise on count I of the complaint. Plaintiffs sought specific performance of the stock purchase agreement. That document expressly provided that the duties of Rothner and Louise thereunder were mutual and dependent. The document also provided that, at the closing of the lease, Rothner would pay Louise $22,000 for the stock and Louise would deliver the stock. It is undisputed that this event did not occur. It is further undisputed that at no time thereafter did Rothner tender the purchase price to Louise. Since Rothner has not performed his part of the stock purchase agreement, plaintiffs are not entitled to specific performance.

Plaintiffs maintain their assertion that Rothner performed his obligations under the stock purchase agreement and that Louise did not perform hers. Plaintiffs contend that Rothner did not pay Louise the $22,000 because none of the parties intended that he do so. Louise, however, remains obliged under the agreement to deliver the stock. Plaintiffs base their interpretation of the parties' intent on the facts and circumstances surrounding the stock purchase agreement, as described in their affidavits.

In construing a contract, a court seeks to ascertain the intent of the parties. (*Susmano*, 97 Ill. App. 3d at 219, 422 N.E.2d at 882.) Courts presume that a written agreement speaks the intent of the signing parties. (*Western Illinois Oil Co. v. Thompson* (1962), 26 Ill. 2d 287, 291, 186 N.E.2d 285, 287; *Titchener v. Avery Coonley School* (1976), 39 Ill. App. 3d 871, 874, 350 N.E.2d 502, 506.) As a result, the intent of the parties must be ascertained, if possible, from the contract itself. (*Bowler v. Metropolitan Sanitary District of Greater Chicago* (1969), 117 Ill. App. 2d 237, 242, 254 N.E.2d 144, 147.) When contract terms are clear and unambiguous, they must be given their ordinary and natural meaning, and no parol or extrinsic evidence may be considered to vary the meaning of the terms. (*Susmano*, 97 Ill. App. 3d at 219, 422 N.E.2d at 882; *Katz v. Diabetes Association* (1975), 31 Ill. App. 3d 240, 243, 333 N.E.2d 293, 295.) If the intent of the parties can be ascertained from the language of the contract itself, rules of construction have no application. (*Kelly v. Terrill* (1971), 132 Ill. App. 2d 238, 240, 268 N.E.2d 885, 886, citing *Bowler*, 117 Ill. App. 2d at 242, 254 N.E.2d at 147.) "Whether or not an ambiguity exists in a contract is to be determined by the court as a matter of law." *Susmano*, 97 Ill. App. 3d at 219, 422 N.E.2d at 882.

These principles preclude the interpretation that plaintiffs assign to the stock purchase agreement. Plaintiffs do not and cannot argue that the document itself is vague or ambiguous. Rather, plaintiffs base their interpretation of the stock purchase agreement solely on the extrinsic facts and circumstances surrounding the document as described in their affidavits. As the trial court correctly observed, plaintiffs' affidavits treat the stock purchase agreement itself as a nullity. The court was correct in that "Rothner would have the court ignore the terms of the very instrument which he claims gives him rights to specific performance and thus to the stock certificate."

The fact that Rothner found the terms of the stock purchase agreement burdensome did not relieve him of his own imprudence in entering into the contract. "Contracting parties are bound by the plain and unambiguous terms of whatever agreements they may have

reached." (*Bowler*, 117 Ill. App. 2d at 243, 254 N.E.2d at 147.) Plaintiffs' affidavits do not contradict the indisputable facts that the stock purchase agreement required Rothner to pay Louise $22,000 for her Central Home stock and that he failed to do so in the manner therein described.

After carefully reviewing the entire record, we conclude that the stock purchase agreement was clear and unambiguous, and that Rothner did not perform his obligations under that document. Accordingly, we hold that plaintiffs are not entitled to specific performance of the stock purchase agreement. We agree with the trial court that the record contains no genuine issue of material fact and that Louise is entitled to a judgment on count I of the complaint as a matter of law.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.