FRANK O. BUTLER II, Plaintiff-Appellant and Cross-Appellee, v. JORIE BUTLER KENT *et al.*, Defendants-Appellees and Cross-Appellants.

First District (3rd Division)   No. 1—94—0770

Opinion filed September 13, 1995.

George N. Vurdelja, Jr., of Vurdelja & Heaphy, and Lee N. Abrams and June E. Daniel, both of Mayer, Brown & Platt, both of Chicago, for appellant.

Dean A. Dickie and Daniel L. Stanner, both of Phelan, Pope, Cahill & Devine, Ltd., of Chicago, for appellees.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Plaintiff Frank O. Butler II (Frank) sought specific performance in connection with the sale of stock pursuant to the terms of a shareholder agreement with his siblings, defendants Jorie Butler Kent (Jorie) and Michael Butler (Michael). The trial court found that Frank had not established the amount due him by clear and convincing evidence and was therefore not entitled to specific performance. We affirm.

On appeal plaintiff contends that the trial court improperly (1) denied his claim for specific performance based on his calculations or, in the alternative, failed to determine a price for Frank's holdings from its own findings; (2) denied him leave to amend his complaint; and (3) refused to admit a particular letter as evidence of Jorie and Michael's intention to be jointly and severally liable. In addition, on cross-appeal, Jorie asserts a right to a jury trial if this case is remanded for a rehearing.

Frank, Jorie and Michael are siblings and heirs to the estate of their father, Paul Butler, who died in 1981. Their inheritance included several parcels of real estate which were bequeathed to them in the form of a trust. In July 1986 the siblings entered into

two separate agreements: (1) a final distribution and settlement agreement (settlement agreement), and (2) a shareholder agreement to effectuate the purposes and provisions of the settlement agreement.

The settlement agreement divided the trust properties into six separate corporations (hereinafter collectively referred to as estate corporations): Harger Corporation, Spring Farm Corporation, Kensington Realty Corporation, Office Realty Corporation, Old Oak Brook Investment Corporation and Village Green Investment Corporation (hereinafter Village Green, the corporation at issue in this case). The principle assets of these corporations were parcels of real estate. The stocks of each corporation were held in equal shares by each sibling.

The shareholder agreement established a "put" procedure whereby each shareholder had the right to require the other two shareholders to either purchase the entire interest of the putting shareholder or sell the corporation with one-third of the sale proceeds to be given to the putting shareholder. To exercise this option, the shareholder had to inform the other two shareholders in writing, *i.e.*, the put. Paragraph 1A of the shareholder agreement specifically provided:

> "Each Shareholder (the 'exercising Shareholder') shall have the right to require the other Shareholders (the 'recipient Shareholders') to either (a) purchase his or her entire interest in any Corporation for a price equal to one-third of the appraised Net Fair Market Value [hereinafter NFMV] of such Corporation plus the principal balance and unpaid interest on the Shortfall Loans made by the exercising Shareholder to such Corporation, or (b) sell such Corporation, by so informing the other Shareholders in writing (the 'Put') ***."

On April 10, 1989, Frank exercised a put for his interest in Village Green. A subsequent dispute over the timing of the appraisal process caused Frank to file a declaratory judgment action on May 25, 1989. The trial court held that the shareholder agreement required the recipient shareholders (Jorie and Michael) to decide whether to buy the interest of the exercising shareholder (Frank) before Frank selected an appraiser. This court affirmed the trial court's holding in *Butler v. Kent* (1991), 215 Ill. App. 3d 680, 576 N.E.2d 7. On August 3, 1989, Jorie and Michael served written notice upon Frank that they had elected to purchase his interest in Village Green.

On May 1, 1990, Frank filed the instant specific performance action seeking to compel Jorie and Michael to perform their obligations under the shareholder agreement, *i.e.*, payment for his stock.

On October 18, 1990, Frank filed a motion for partial summary judgment on the issue of liability. On June 28, 1991, the circuit court granted partial summary judgment on the issue of liability in favor of Frank, finding that there was no genuine issue of material fact over defendants' obligation to perform under the shareholder's agreement. The circuit court found that in accordance with the shareholder agreement, the appraisals had been performed and had set the gross fair market value of Village Green to be $15.6 million for the purpose of valuing Frank's shares as of the date on which Jorie and Michael were obligated to close their purchase of Frank's shares. Frank's action for specific performance was filed upon the failure of Jorie and Michael to close the purchase and their refusal to honor the shareholder agreement.

On November 18, 1991, Frank filed a motion for summary judgment alleging that the sum of $4,235,211.67 was owed to him by defendants for the purchase of his shares which the trial court denied on February 11, 1992.

On April 9, 1992, the court entered an order setting trial on the complaint for specific performance with proof limited to two issues: (1) whether liability is several or joint and several, and (2) the NFMV of the shares of stock in Village Green.

As to the first issue, the trial court found that Frank, based on the evidence admitted, conceded that Jorie and Michael were not jointly and severally liable and thus Jorie could only have a several obligation for the purchase of one-half of Frank's interest.

Regarding the NFMV issue, the starting point was the gross fair market value of Village Green, which had already been established at $15.6 million on the valuation date upon which Jorie and Michael were obligated to close their purchase of Frank's shares.

To determine the NFMV of the Village Green shares, the shareholder agreement provided a specific formula:

> "The 'Net Fair Market Value' of a Corporation shall be the Fair Market Value of its assets as determined by the appraisers, *** minus *(i) all liabilities of the Corporation (including all Shortfall Loans, but not including guaranties and similar contingent liabilities respecting loans of other Corporations)*, (ii) any amounts payable under the incentive compensation agreements (as defined below), and (iii) the cost of the appraisal." (Emphasis added.)

The primary dispute concerns the specific deductions for "all liabilities" of Village Green required by "(i)" of the shareholder agreement.

The trial court found that Frank had satisfied his burden to prove that there should be no deduction to the NFMV for the incentive

compensation agreements (item (ii)). This appeal presents no issue as to amounts payable under these agreements.

Regarding the cost of appraisal (item (iii)), the parties advanced different amounts. Franks' expert witness, Thomas Beneventi, testified to an appraisal cost of $48,000. One of Jorie's expert witnesses, Benjamin Perks, testified to an appraisal cost of $108,330.

To establish the specific amount to be deducted as liabilities of Village Green as provided in item (i), the parties presented evidence for expenses such as taxes, accounting fees, engineering fees and legal fees.

The parties particularly contested the use of certain obligations as liabilities in determining the fair market value of Frank's interest. These obligations were: (1) special note 1 and special note 2 in the amount of $1,066,974; (2) a Boulevard Bank note in the principal amount of $4.975 million (Village Green note); and (3) a Boulevard Bank note in the principal amount of $7.85 million (Office Realty note). All of these notes derived from the following transactions:

In 1986, before the Butler siblings executed the settlement agreement, the six estate corporations had to obtain a loan to satisfy the debts of Paul Butler's estate by executing a principal note (the 1986 note) in the amount of $8.25 million with Boulevard Bank. Each estate corporation was held jointly and severally liable, and the note was secured with mortgages on each of the properties transferred from the trust to the several corporations.

The 1986 note was refinanced in 1987 through two notes (collectively referred to as the Boulevard notes) described above. The Village Green note was made and executed by each of the six estate corporations and was secured by the same mortgages which secured the 1986 note. The Office Realty note was made and executed by Boulevard Bank, as trustee for a trust to which the Office Realty property had been titled and in which Office Realty held a substantial beneficial interest. Boulevard Bank, as trustee, was not personally liable to pay the balance or any interest on the note. The note was secured by a mortgage on the Office Realty property and further secured by mortgages on the real estate of four of the other estate corporations (Village Green, Harger, Kensington Realty and Old Oak Brook Investment). Additionally, the corporations executed a guaranty wherein they jointly and severally guaranteed payment of the Office Realty note.

On October 22, 1987, two demand notes (special notes 1 and 2) were executed to Office Realty for the purpose of reallocating the Boulevard notes on the records of the estate corporations. Four corporations (Village Green, Harger, Kensington Realty and Old Oak

Brook Investment) executed to Office Realty a demand note for $2.085 (special note 1) and another demand note for $300,000 (special note 2), which was transferred to Oak Brook Office Corporation (not an estate corporation). As makers of these special notes, the four estate corporations (Village Green, Harger, Kensington Realty and Old Oak Brook Investment) were jointly and severally obligated.

Frank maintained that Village Green's liability for the two special notes was $1,066,974 and for the Village Green note (one of the Boulevard notes) was $1,637,199. Applying these figures, Frank asserted that the shares of Village Green had a positive NFMV ($12,705,635) and thus is owed $4,235,212, which represents one-third of the NFMV.

Jorie and Michael, on the other hand, proposed that Village Green's liability for the two special notes was $2,977,582 and for the two Boulevard notes (the Village Green and Office Realty notes) was $10,921,313. Applying these figures, Jorie and Michael contended that the liabilities of Village Green exceeded its worth so the shares of Village Green had a negative value ($64,685) and they owed nothing to Frank.

The lengthy trial extended from April to December 1992, and included over 88 exhibits and 15 witnesses with 3 experts. Thomas J. Beneventi (Beneventi) testified as an expert on behalf of Frank. Benjamin W. Perks (Perks) and Michael Weininger (Weininger) testified as experts on behalf of Jorie.

Beneventi established himself as a certified public accountant and a tax accounting specialist. Beneventi and Frank are co-investors in a business venture. From 1986 through 1989, Beneventi prepared the income tax returns for each of the estate corporations.

By applying the same allocation method used to prepare the tax returns of the estate corporations, Beneventi assessed Village Green's liability for special notes 1 and 2 and the Village Green note. Liability allocations were proportionally based on the fair market values of the assets measured for estate tax purposes in June 1981. The allocations were then regularly adjusted for capitalizing expenses such as real estate taxes and maintenance. Thus, the recorded liability for each note made by multiple estate corporations was divided according to the adjusted value of each corporation's real estate holdings.

Beneventi did not attribute any liability to Village Green for its guaranty of the Office Realty note ($7.85 million) because the shareholder agreement provided that guaranties were not to be included as liabilities. When assessing Village Green's liability, Beneventi did not apply Financial Accounting Standards Board pro-

nouncement number 5 (FASB-5), the standard for determining when a guaranty constitutes a liability. Beneventi did not routinely or customarily consider FASB-5 in determining a corporation's liabilities.

Perks, an expert on behalf of Jorie and Michael, is also a certified public accountant and an auditing specialist. Perks testified that FASB is the rulemaking body of the American Institute of Certified Public Accountants and its application is GAAP ("Generally Accepted Accounting Principles").

FASB-5, according to Perks, determines which liabilities are attributable to Village Green. FASB-5 dictates when, in the case of an uncertainty, a loss or liability should be recorded on an entity's financial statements. If a liability is to be recorded, two standards must be met: the event is probable of occurrence and the liability can be reasonably estimated.

Regarding the Village Green note, Perks testified that, under FASB-5, Village Green should record the entire $4.975 million as a liability. Perks reasoned that of the six estate corporations, which were jointly and severally liable on the note, only Village Green had any significant ability to repay the obligation. By October 31, 1989, Kensington Realty had been dissolved and released from its obligations by Boulevard; Old Oak Brook Investment owned no real estate; the real estate holdings of Harger and Spring Farm were of insignificant value in relation to the size of the loan; Office Realty no longer owned any property after transferring its property to a joint venture (Buck/Butler Joint Venture); and the value of Village Green's property was evidenced by a pending offer of $17 million. Perks applied the same rationale to account for the liability incurred from the two special notes.

As to the Office Realty note, Perks testified that its full amount should be attributed to Village Green because the actual maker of the note is Boulevard, a trustee and nonrecourse debtor; the sole beneficiary of the land trust (Buck/Butler Joint Venture) is a nonrecourse debtor; and the language of the shareholder agreement which exempts "guaranties and similar contingent liabilities respecting loans of other Corporations" from the calculation of liability did not apply to the Office Realty note because Boulevard, the note's maker, was not an estate corporation as defined by the shareholder agreement. As a result, the six estate corporations are the primary obligors of the Office Realty note with joint and several liability, as delineated in the guaranty. Once this liability is established, the real estate holdings as of October 31, 1989, indicate that Village Green would likely be called upon to pay the note.

Perks also testified that the asset valuations in each estate

corporation's tax return were not considered assessments of the respective property's fair market value as of October 31, 1989.

Michael Weininger, another expert witness on behalf of Jorie and Michael, testified that the entirety of the Boulevard notes should be listed by Village Green as a liability. Village Green and the estate corporations gave a guaranty of payment, which acts as a primary obligation, on the Office Realty note and creditors would not be required to act against the Office Realty property before pursuing the estate corporations under the guarantee.

The parties stipulated that Jorie's December 1988 financial statement listed the net value of her one-third interest in Village Green at $4 million; Office Realty at $2.7 million; Harger at $167,000; and Old Oak Brook at $200,000. Jorie testified that no material adverse change occurred in these financial evaluations during 1989. These same land market values for the four estate corporations were listed in Michael's December 1989 financial statement.

By final order dated February 1, 1994, the trial court denied Frank's claim for specific performance and incorporated in its order the reasons set forth in its January 15, 1993 memorandum of opinion. In its January 15, 1993, memorandum of opinion, the trial court, among other things, made three specific findings:

"(A) That Plaintiff did not prove by clear and convincing evidence that Special Notes 1 and 2 were a liability of VGIC [Village Green] in the amount of $1,066,974.00.

(B) That Plaintiff did not prove by clear and convincing evidence that the notes payable to Boulevard Bank were not a liability of VGIC within the meaning of the SHA [shareholder agreement].

(C) That Plaintiff proved by clear and convincing evidence no amounts were payable under the ICAs [incentive compensation agreements]."

The trial court further found that the testimony of Beneventi, Frank's expert, was "lacking" and his assessment lacked "the weight of professional corroboration." On the other hand, the trial court found the professional credentials and testimony of Perks, defendants' expert, to be convincing. The court also ruled that a

"court of equity can only require specific performance of a contract entered into by the parties and cannot itself create a contract or supply its material terms (here, the NFMV of the [Village Green] stock) if they do not exist."

Accordingly, the trial court held that it was not obliged to determine how much, if anything, Frank was owed because such determination was beyond the scope of the relief requested.

In addition, the court questioned whether the subject matter of

this case is susceptible to specific performance since "the performance requested by Plaintiff is nothing more than a calculation of cash that is due him." The court then observed that Frank could "now proceed to seek the remedy of breach of contract which may have been the appropriate remedy in the first place."

On February 19, 1993, the trial court granted Frank's motion to file an amended complaint alleging breach of contract. On April 27, 1993, the court deemed Jorie's motion for entitlement to attorney fees and costs as prevailing party in the specific performance action premature because Frank's amended complaint rendered the specific judgment less than a final order. On June 3, 1993, however, the court vacated its earlier decisions and denied Frank leave to amend.

On appeal, Frank first asserts that the trial court erred in declining to grant him specific performance of his claim based on his contention that the NFMV of Village Green was $12,705,635. Frank argues that the trial court erred in applying the accounting methods articulated in FASB-5 and GAAP standards to the shareholder agreement despite evidence that the intent of the parties was to the contrary and that no credible evidence established that the estate corporations other than Village Green had insufficient value to pay their proportionate shares of the special notes and the Boulevard Bank obligations.

We believe that generally accepted accounting standards do not come to us with the force of law. The parties may limit their application expressly or impliedly. The transaction that created the Village Green and Office Realty notes made the Village Green Investment Corporation a primary obligor on the notes and placed a mortgage upon its real estate holdings without the requirement that the lender resort to the property of the other estate corporations before seeking to satisfy the debt against Village Green or its property.

■ Specific performance is an equitable remedy in contrast to a remedy at law, which is the payment of money as a substitute for performance. *Daniels v. Anderson* (1994), 162 Ill. 2d 47, 56, 642 N.E.2d 128.

It has long been held that specific performance cannot be demanded as a matter of right, even where the contract is clear and unambiguous. (*Daniels*, 162 Ill. 2d at 56; *Sweeting v. Campbell* (1956), 8 Ill. 2d 54, 56, 132 N.E.2d 523; *Schneiderman v. Kahalnik* (1990), 200 Ill. App. 3d 629, 633, 558 N.E.2d 334.) Instead, the remedy in a specific performance action rests within the sound discretion of the trial court, based on all of the facts and circumstances in evidence. *Daniels*, 162 Ill. 2d at 56, citing *Rothner v. Mermelstein* (1991), 219 Ill. App. 3d 502, 507, 579 N.E.2d 1022 (and authorities cited therein); *Sweeting*, 8 Ill. 2d at 56.

Specific performance can be available for causes of action involving agreements on the sale or transfer of shares of stock where the shares are not available on the open market. *E.g., Rothner*, 219 Ill. App. 3d 502, 579 N.E.2d 1022; *Rench v. Leihser* (1986), 139 Ill. App. 3d 889, 487 N.E.2d 1201.

However, clear, explicit and convincing evidence is required to support a grant of specific performance. *Omni Partners v. Down* (1993), 246 Ill. App. 3d 57, 62, 614 N.E.2d 1342; *Schneiderman*, 200 Ill. App. 3d at 633.

Where testimony is conflicting in a bench trial, the findings of the trial court will not be disturbed unless they are against the manifest weight of the evidence. *In re Application of County Treasurer* (1989), 131 Ill. 2d 541, 549, 546 N.E.2d 506.

■ In light of these principles, we find no reason to disturb the trial court's denial of specific performance. A heightened standard of proof required Frank to establish his claim for specific performance by clear and convincing evidence. The parties presented extensive testimony and evidence on all the matters now argued on appeal, such as the proper method of accounting, the indebtedness from certain obligations (special notes and Boulevard notes), the value of the estate corporations, and the ultimate liabilities of Village Green. The alleged deficiencies and conflicts in witnesses' testimony do not demonstrate that the trial court abused its discretion in finding that Frank failed to establish the NFMV of Village Green as provided in the shareholder agreement.

In the alternative, Frank asserts that even assuming that the trial court correctly found that his alleged deductions had not been proven by clear and convincing evidence, the trial court should have granted his claim for specific performance at a price which the trial court itself could calculate. Additionally, Frank claims that he is entitled to an award of equitable damages. We disagree.

■ The equitable remedy of specific performance requires a party to perform an affirmative act to fulfill a contract. (*Goodwine State Bank v. Mullins* (1993), 253 Ill. App. 3d 980, 1008, 625 N.E.2d 1056.) The province of a court in a specific performance action is to enforce the contract which the parties have made, not to make a contract for them and then enforce it. (*Goodwine State Bank*, 253 Ill. App. 3d at 1010.) In other words, "[t]he contract must be enforced according to its terms or not at all." *Sweeting*, 8 Ill. 2d at 58.

■ To obtain the equitable remedy of specific performance, the law mandates a greater degree of certainty than is necessary to warrant recovery of damages at law. *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 33, 421

N.E.2d 1375 (denial of specific performance was not an abuse of discretion where "the chancellor may well have concluded that the requisite certainty for specific performance was lacking" since the option price was undefined in the subject contract); see also *Sweeting*, 8 Ill. 2d at 58 ("where the amounts or maturities of the mortgages in such cases are uncertain or left to the future determination of the parties themselves, specific performance will be denied"); *White Hen Pantry, Inc. v. Rak Woo Cha* (1991), 214 Ill. App. 3d 627, 634, 574 N.E.2d 104 ("[t]he law requires a greater degree of specificity regarding the essential terms of a contract when a party seeks specific performance of a contract than for other purposes").

Frank's reliance on *Dodds v. Giachini* (1979), 79 Ill. App. 3d 358, 398 N.E.2d 205, *rev'd on other grounds* (1981), 84 Ill. 2d 284, 418 N.E.2d 704, is unavailing. In *Dodds*, the plaintiff sought specific performance on an agreement which included a real estate lease, a stock purchase, and a repurchase of substandard loans. This court granted specific performance on the stock purchase and the loan repurchase options because they were sufficiently certain and definite. However, specific performance was denied as to the real estate lease option because the plaintiff had failed to satisfy the required clear and convincing burden of proof. This court found that "[w]here specific performance of a whole contract is not possible, a court may grant specific performance to the remainder of the contract which is capable of performance." *Dodds*, 79 Ill. App. 3d at 364.

The *Dodds* case involved distinct options that were conducive to separate determinations of certitude, but in the present case, the NFMV of Village Green cannot be established without resolving the value of each of its individual terms.

■ In the present case, Frank failed to prove Village Green's liabilities. Moreover, the trial court did not find that Jorie's proposals were proven by clear and convincing evidence. In light of the degree of certainty required in a specific performance action and the prohibition upon a court to rewrite a contract for parties, we reject Frank's suggestion that the trial court should select or reject dollar amounts advanced by the parties to surmise an appropriate dollar amount. In essence Frank is only saying that if the court does not like his figures, use Jorie's or an assortment of both as long as the result would be a positive NFMV. We cannot find that a court has such authority in a specific performance action.

■ Frank also contends that equitable damages should have been awarded based on *Gordon v. Bauer* (1988), 177 Ill. App. 3d 1073, 532 N.E.2d 855. Unlike the instant case, however, the specific performance claim in *Gordon* was voluntarily dismissed and thus there was

no finding that the specific performance claim failed. (*Gordon*, 177 Ill. App. 3d at 1082.) A court's jurisdiction in equity on damage claims will fail where, as here, the claim for equitable relief fails. *Gordon*, 177 Ill. App. 3d at 1082.

Frank next asserts that he is entitled to amend his complaint to seek money damages for breach of contract after the close of the trial and after an adverse holding.

■ There is no absolute right to amend a pleading. (*E.g., Green v. University of Chicago Hospitals & Clinics* (1994), 258 Ill. App. 3d 536, 543, 631 N.E.2d 271.) The trial court has broad discretion in ruling upon motions to amend pleadings. *Bank of Chicago v. Park National Bank* (1994), 266 Ill. App. 3d 890, 904, 640 N.E.2d 1288.

To determine whether the trial court abused its discretion, we usually consider four factors: (1) whether the proposed amendment is timely; (2) whether previous opportunities to amend the pleading could be identified; (3) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; and (4) whether the proposed amendment would cure the defective pleading. (*Loyola Academy v. S&S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 273, 586 N.E.2d 1211.) To justify the denial of leave to amend a complaint, a trial court need find against the movant on all four factors. *Saieva v. Budget Rent-A-Car* (1992), 227 Ill. App. 3d 519, 531, 591 N.E.2d 507 (trial court did not abuse its discretion in denying the plaintiff leave to file an amended complaint).

"Amendments ordinarily will not be permitted after trial has begun if the proposed amendment raises matters of which the pleader had full knowledge at the time of interposing the original pleading and there is no excuse for failing to raise those matters in the original pleading." *Bank of Chicago*, 266 Ill. App. 3d at 904 (the trial court did not abuse its discretion in denying leave to file an amended complaint where the plaintiff made the motion 10 days into trial after the close of its case in chief and the motion raised no new factual allegations); *Carlisle v. Harp* (1990), 200 Ill. App. 3d 908, 915, 558 N.E.2d 318 (and cases cited therein); see also *Mendelson v. Ben A. Borenstein & Co.* (1992), 240 Ill. App. 3d 605, 618-20, 608 N.E.2d 187 (denied plaintiff leave to amend complaint to change his theory after summary judgment had been entered against plaintiff).

■ In the present case, Frank filed a one-count complaint for specific performance in 1990 and requested leave to file an amended complaint based on a breach of contract claim in January 1993, *i.e.*, after the trial ended, after the court ruled against him on his specific performance claim and after the court denied him equitable damages. The record reveals many occasions on which the nature of

Frank's complaint was addressed, particularly the fact that his claim was not made as a breach of contract action or, in the alternative, filed as a two-count complaint with both a specific performance claim and a breach of contract claim. While Jorie maintains that Frank steadfastly anchored his action in specific performance to recover attorney fees and costs, Frank submits that he decided to persist in a one-count specific performance action to obtain the relatively quicker relief afforded in the chancery division as opposed to the law division. Regardless of the motive for failing to advance a breach of contract claim before the trial ended, Frank knowingly and persistently chose his course of action. Additionally, such action would deny Jorie her right to a trial by jury as to a breach of contract claim. We find no reason to disturb the trial court's denial of leave to amend his complaint now to pursue the exact same matter with the exact same facts in a different forum.

■ Frank next contends that the trial court erred in failing to admit a certain letter (plaintiff's exhibit 11) proffered by Frank to demonstrate that Jorie and Michael agreed to be jointly and severally liable for the purchase of Frank's stock in Village Green. Frank's exhibit 11 is a letter dated May 26, 1989, from Bank One in Milwaukee, advising Jorie and Michael that it approved their request for a loan to "be used to acquire ownership interest from" Frank in Village Green. The loan approval letter from Bank One stated that "[t]he note shall be unconditionally guaranteed by Jorie Butler-Kent and Michael Butler, jointly and severally." The loan contemplated by this letter remained open until September 30, 1989, but was never consummated.

The admissibility of evidence is committed to the sound discretion of the trial court. (*Caponi v. Larry's 66* (1992), 236 Ill. App. 3d 660, 674, 601 N.E.2d 1347.) The trial court does not abuse its discretion in rejecting evidence which is of little probative value or incompetent to prove a matter at issue (*Laff v. Chapman Performance Products, Inc.* (1978), 63 Ill. App. 3d 297, 313, 379 N.E.2d 773) or is not helpful in proving or disproving a matter in controversy because the inference to be drawn from the evidence is too vague or conjectural (*e.g., Moore v. Swoboda* (1991), 213 Ill. App. 3d 217, 238-39, 571 N.E.2d 1056).

In the present case, the shareholder agreement provides that the parties' liability is not joint and several unless they otherwise agree. We agree with the trial court and believe that the loan approval by Bank One holds no probative value in determining the liability among the three siblings. The loan request and the letter that was issued indicate Jorie and Michael's potential obligation to Bank One,

not to Frank. There is no indication that Jorie or Michael expressed any intention to be jointly liable to Frank.

In light of our disposition of this appeal, we do not address Jorie's cross-appeal raising a right to a jury trial in the event we had remanded the case.

Affirmed.

TULLY and CERDA, JJ., concur.