WAYLAND PHILLIPS, Plaintiff and Counterdefendant-Appellant and Cross-Appellee, v. ANDREW McCULLOUGH, as Ex'r of the Estate of Mary McCullough, Deceased, Defendant and Counterplaintiff-Appellee and Cross-Appellant (Jenny Phillips *et al.*, Counterdefendants).

Second District   No. 2—95—0937

Opinion filed March 15, 1996.

Carl F. Safanda, of Safanda Law Firm, of St. Charles, for appellant.

Harry Schaffner, of Schaffner & Van Der Snick, P.C., of Geneva, Van R.

Richards, Jr., of Schnell, Richards, Brown & Freeman, P.C., of Elgin, and Sandra G. Nye, of Sandra G. Nye & Associates, of Chicago, for appellee.

JUSTICE GEIGER delivered the opinion of the court:

Both the plaintiff-counterdefendant, Wayland Phillips, and the defendant-counterplaintiff, Andrew McCullough, as executor of the estate of his mother, Mary McCullough, f/k/a Mary Josephine Phillips (the decedent), appeal from the trial court's entry of judgment in favor of the defendant on the plaintiff's complaint for specific performance and on the defendant's counterclaim for declaratory judgment. At issue on appeal is whether section 6.55 of the Business Corporation Act of 1983 (the Act) (805 ILCS 5/6.55 (West 1994)), which permits written restrictions on the transfer or registration of transfer of a security of a corporation, extends those restrictions to testamentary transfers. We affirm.

The plaintiff is the owner of one of the five issued and outstanding shares of common stock of H.A. Phillips & Co. (the Corporation), an Illinois corporation. At the time of her death on June 14, 1993, the decedent was the holder of $1^1/_3$ shares of the Corporation's common stock (the subject shares), which were registered in her maiden and married names. In her will, the decedent provided that the subject shares were to pass to the defendant individually, to the decedent's other two children, and to the defendant as trustee of a trust for his father, the decedent's ex-husband.

As set forth in a document dated September 7, 1960, the plaintiff, the decedent, and the two remaining shareholders, counterdefendants David Phillips and Jenny Phillips, entered into a written agreement (the Agreement), signed by each of them, which restricted the transferability of all five of the issued and outstanding shares of the Corporation. Section 1 of the Agreement provided, *inter alia*:

> "Before any sale, assignment, transfer or other disposition (whether voluntary or involuntary, and whether caused, permitted or occasioned by any act or sufferance, of any of the parties hereto, or otherwise) of any shares of stock of Company at the time owned or held by any of the parties hereto shall be made attempted or occur, the party whose share or shares of stock of Company are thus proposed to be sold, assigned, transferred or otherwise disposed of shall serve written notice thereof upon each of the other parties hereto no less than 60 days prior to the last day of the month in which any such proposed sale, assignment, transfer or other disposition is to take place."

Under section 2 of the Agreement, the parties receiving the notice required in section 1 would have the prior and exclusive right and option to purchase the shares proposed to be sold, assigned,

transferred or otherwise disposed of. Section 2 provided further that a party seeking to exercise said right and option was required to serve notice in writing of such intention within one month after receipt of the notice given pursuant to section 1 of the Agreement at a purchase price equal to the book value of the shares or the purchase price made in any *bona fide* offer. Under section 7 of the Agreement, any "declaration, demand, request or notice of any kind or character, or for any purpose whatsoever, upon the other parties" was to be made in writing and sent by registered or certified mail.

Section 4 of the Agreement set forth the procedure for the purchase of shares of stock pursuant to the Agreement. Under that section, every such purchase of stock would be consummated "at such bank or trust company in Chicago, Illinois, as the purchasers may have designated for such purpose in the written notice of election to purchase such shares given pursuant to Section 2, and such purchase shall be deemed to have been completed upon the deposit by such purchasers on or before sixty (60) days from the date of purchase, of the entire purchase price, as set forth in Section 2 of this Agreement, in cash." Section 4 also required that, at or before the time provided for the deposits to be made by the purchasers, a certificate or certificates in transferable form representing the shares to be purchased, duly endorsed for transfer to the purchasing parties, together with the documentation required for the effective transfer of the stock, be deposited for delivery to the purchasers upon their deposit of the purchase price.

The Agreement further authorized and directed the Corporation to make reference to the Agreement and its restrictions in a written statement contained on all the Corporation's stock certificates, "whether now or hereafter to be issued." Additionally, section 8 of the Agreement noted that the rights, obligations and restrictions thereunder "shall extend to and bind or inure to the benefit of *** not only the parties hereto, but also their respective heirs, legal representatives, successors and assigns, and shall apply to any shares of stock of Company hereafter issued by Company (whether now or hereafter authorized), as well as to the shares of stock of Company now issued and outstanding (whether now owned or hereafter acquired by any parties hereto)." Finally, section 9 stated the provisions of the Agreement would be deemed to be continuing provisions and apply to every successive sale, assignment, transfer or other disposition of the shares of stock of the Corporation and that the fact that said provisions may not have been availed of in any instance "shall not be deemed to waive or dispense with any such provisions in any subsequent or other instance."

On July 19, 1993, the decedent's will was admitted to probate and the defendant was named executor of her estate. Thereafter, in a letter to the plaintiff dated August 23, 1993, the defendant stated, "You have expressed concern over the disposition of my mother's assets. Therefore, I am sending you a copy of her will." At trial, the plaintiff testified that she telephoned the defendant upon her receipt of his letter and informed him that she had already obtained a copy of the decedent's will.

By letter dated December 10, 1993, the plaintiff informed the defendant and the two counterdefendants of her intent to exercise her option to purchase the subject shares under the terms of the Agreement. The letter noted that the plaintiff would be depositing at least $26,656.95 in a shares and money escrow account, representing her proportionate interest in the subject shares based on a book value of $97,742.13 for said shares. The plaintiff further stated that if the counterdefendants did not exercise their option to purchase their respective portion of the shares, she would deposit all the funds necessary to purchase the shares herself. The plaintiff ultimately deposited $31,452.69 in an escrow account at the State Bank of Geneva and obtained a line of credit in the amount of $150,000 for the purchase of all of the subject shares.

In response to the plaintiff's letter, counsel for the estate sent a letter questioning the existence of any shareholders' agreement. Counsel stated that such an agreement had been mentioned to him a couple of years earlier. Since that time, he had asked on several occasions that the original Agreement be produced, if it existed, but none had been produced to date. Counsel also noted that several transfers between the plaintiff and counterdefendant Jenny, which had been made without compliance with any of the requirements implied in the plaintiff's letter, provided further evidence that the Agreement did not exist and had not existed for years. The letter concluded that, in the absence of evidence that the Agreement existed and was in effect, the estate was not in a position to comply with the plaintiff's desire to purchase the subject shares.

On January 10, 1994, the plaintiff filed the instant action seeking specific performance of the Agreement. The defendant then filed his counterclaim for declaratory judgment. Following a bench trial, the trial court entered judgment against the plaintiff and in favor of the defendant. In announcing its judgment, the court found that there was a valid and enforceable contract; that the plaintiff had complied with or was ready, willing, and able to comply with the terms of the contract; and that the defendant failed to perform his obligation under the contract.

The court then turned to the issue of whether the contract as written was enforceable following the death of one of the parties. Relying on our supreme court's decision in *Vogel v. Melish*, 31 Ill. 2d 620 (1964), the court found that the restriction on transfer of the Corporation's shares would not be applicable to a transfer upon death. The court observed that the language used in *Vogel*—"sell, transfer, assign, convey, or otherwise dispose of" (31 Ill. 2d at 622)— was essentially the same as that used in the case at bar. While acknowledging the subsequently enacted amendment to the Act, which permits a restriction on transfer to be enforced against a successor of the holder of a restricted security, including an executor (805 ILCS 5/6.55 (West 1994)), the court nonetheless stated that any intent of the legislature to reverse the holding in *Vogel* was "less than clear" from the language used in section 6.55 of the Act. The court thus concluded that *Vogel* remained controlling law and found the Agreement to be inapplicable to the decedent's testamentary transfer of the subject shares. This appeal followed.

On appeal, the plaintiff argues that the court's reliance on *Vogel* was misplaced in light of the enactment of section 6.55 of the Act. In *Vogel*, the plaintiff and the decedent, both shareholders, had entered into a mutual agreement requiring that if either party desired to "sell, transfer, assign, convey or otherwise dispose of" all or part of his shares, he would first offer such shares to the other. *Vogel*, 31 Ill. 2d at 622. Paragraph 6 of the agreement further provided that its provisions would be " 'binding upon and inuring to the benefit of the parties hereto and their respective administrators, executors, heirs and personal representatives.' " *Vogel*, 31 Ill. 2d at 622. Following the decedent's death and his bequest of his shares to a third party in trust for the benefit of his widow for life and then his two sons, the plaintiff filed a declaratory judgment action seeking to determine his rights under the shareholders' agreement. *Vogel*, 31 Ill. 2d at 622-23.

The *Vogel* court first noted that the shareholders' agreement was a restraint on the alienation of the parties' shares and, as such, was to be strictly construed. *Vogel*, 31 Ill. 2d at 624-25. The court then stated:

> "The occurrences giving rise to the option to purchase are *inter vivos* transfers, the agreement reciting 'sell, transfer, assign, convey or otherwise dispose of;' there is no express restriction on intestate or testamentary disposition, and under the rule of strict construction, none can be implied." *Vogel*, 31 Ill. 2d at 625.

The court opined that, in view of the detail of the agreement, it was unreasonable to assume that the parties intended it to survive the death of either of them and to be susceptible to performance by their

heirs or devisees when no provision for that contingency was made in the agreement. *Vogel*, 31 Ill. 2d at 625. The court stated further that in light of the personal character of the stockholders' agreement—including the provision that each party would have "personal custody" of the other's shares and assume all liability for the safe-keeping of his share certificates—the provision that the agreement would be binding upon and inuring to the benefit of the parties' heirs did not negate the implied condition that the death of either party would excuse the survivor from further performance. *Vogel*, 31 Ill. 2d at 625-27.

The rule in *Vogel* falls in line with the majority of jurisdictions that have considered the question of whether general restrictions on the transfer of stock apply to testamentary transfers without a specific reference to such transfers. See *Kerr v. Porvenir Corp.*, 119 N.M. App. 262, 265-66, 889 P.3d 870, 872-73 (1994). See also Annot., *Restrictions on Transfer of Corporate Stock as Applicable to Testamentary Dispositions Thereof*, 61 A.L.R.3d 1090 (1975 & Supp. 1995). Later Illinois courts have also cited *Vogel* for the proposition that where a right of first refusal is silent as to its duration, the right will be considered personal, thus terminating upon the death of a party to the agreement. See *Kellner v. Bartman*, 250 Ill. App. 3d 1030, 1037 (1993) (alleging breach of written contract containing a right of first refusal on the sale of real estate); *Cronin v. McCarthy*, 264 Ill. App. 3d 514, 527 (1994) (alleging breach of an option to purchase in a real estate partnership). Yet we have found no case which has examined the continued applicability of *Vogel* to restrictions on transfers of corporate securities following the enactment of section 6.55 of the Act.

■ Section 6.55, which became effective in 1991, provides, in pertinent part:

"§ 6.55 Restriction on transfer of securities.

(a) A written restriction on the transfer or registration of transfer of a security of a corporation, if permitted by this Section 6.55 and noted conspicuously on the certificate representing the security[,] *** may be enforced against the holder of the restricted security or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder. ***

(b) A restriction on the transfer or registration of transfer of securities of a corporation may be imposed either by the certificate of incorporation or by the by-laws or by an agreement among any number of security holders or among such holders and the

corporation. No restriction so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction.

(c) A restriction on the transfer of securities of a corporation is permitted by this Section if it:

> (1) obligates the holder of the restricted securities to offer to the corporation or to any other holders of securities of the corporation or to any other person or to any combination of the foregoing, a prior opportunity, to be exercised within a reasonable time, to acquire the restricted securities; \*\*\*

\* \* \*

\*\*\*

(e) Any other lawful restriction on transfer or registration of transfer of securities is permitted by this Section." 805 ILCS 5/6.55 (West 1994).

Substantially similar provisions have been adopted in other jurisdictions as well. See, *e.g.*, Ala. Code § 10—2B—6.27 (1994); Del. Code Ann. tit. 8, § 202 (1991); Idaho Code § 30—1—23A (1979); Kan. Stat. Ann. § 17—6426—(a) (1995); Okla. Stat. tit. 18, § 1055 (1986); Tex. Bus. Corp. Act Ann. art. 2.22(C) (West 1994).

In *Dixie Pipe Sales, Inc. v. Perry*, 834 S.W.2d 491 (Tex. Ct. App. 1992), a Texas court held that a corporation was entitled to exercise a right of first refusal contained in its bylaws when a transfer of restricted shares was made by the will of a deceased shareholder. Under the Texas Business Corporation Act (the Texas Act), a reasonable restriction on the transfer or registration of a security, if noted conspicuously on the certificate, is specifically enforceable "against the holder of the restricted security of any successor or transferee of the holder." Tex. Bus. Corp. Act Ann. art. 2.22(C) (West 1994). As originally enacted, the Texas Act provided that the restrictions would be specifically enforceable " 'against the holder of the restricted security or any successor or transferee of the holder including an executor, administrator, trustee, guardian, or other fiduciary entrusted with like responsibility of the person or estate of the holder.' " *Dixie Pipe Sales*, 834 S.W.2d at 493-94, quoting Act of September 6, 1955, 54th Leg., R.S., ch. 64, 1955 Tex. Gen. Laws 239, amended by Act of August 28, 1989, 71st Leg., R.S., ch. 801, § 8, 1989 Tex. Gen. Laws 3618. The court noted that the "superfluous" express reference to executors, administrators, trustees, guardians, or other fiduciaries was deleted because those persons were "clearly included" in the terms "successor" and "transferee." *Dixie Pipe Sales*, 834 S.W.2d at 494. Rejecting the argument that a restriction must be made

expressly applicable to a testamentary transfer to be valid, the court held that under the Texas Act, a reasonable, conspicuously noted restriction would be enforceable against an executor, as a successor or transferee of the holder. To hold otherwise, opined the court, would give a holder more rights to transfer her stock in death than she had in life. *Dixie Pipe Sales*, 834 S.W.2d at 494.

■ We find the court's rationale in *Dixie Pipe Sales* to be persuasive. Unlike the statute under consideration in that case, section 6.55(a) expressly lists an executor of the holder as a person against whom a restriction against transfer may be enforced. 805 ILCS 5/6.55(a) (West 1994). Although we do not abandon the requirement that a shareholders' agreement regarding stock transfer restrictions be strictly construed (*Rench v. Leihser*, 139 Ill. App. 3d 889, 891 (1986)), we believe that section 6.55's express reference to executors evinces a legislative intent to overrule *Vogel*'s holding that such restrictions will terminate upon the death of one of the parties unless the parties specify otherwise. We conclude, therefore, that a shareholders' agreement restricting stock transfers will extend to and be enforceable against testamentary transfers as well, absent an express provision to the contrary. Accordingly, we find that the trial court here erred in not finding the terms of the Agreement enforceable against the defendant as the executor of the decedent's estate.

The defendant contends, however, that this court should not look to the 1991 amendment to the Act, but to the law in effect at the time that the parties entered into the Agreement in 1960 and should apply the rationale of *Vogel*, which was decided in 1964. We disagree. The crucial date for determining the applicability of a statute is when the cause of action accrued. *Zielnik v. Loyal Order of Moose, Lodge No. 265*, 174 Ill. App. 3d 409, 411 (1988). Because the attempted disposition in the case at bar was testamentary in nature, no cause of action accrued until the decedent's death in 1993, after the effective date of the amendment. Any application of section 6.55 of the Act, therefore, would only be prospective in nature.

■ Having concluded that the Agreement's restrictions on the "sale, assignment, transfer or other disposition" of the Corporation's stock were applicable to the decedent's attempted bequest of her shares, we turn to the question of whether the plaintiff is entitled to specific performance of the Agreement. Where, as here, shares of corporate stock are not available on the open market and have no market value, agreements imposing permissible restrictions on their transfer or sale may be enforced by specific performance. *Rench*, 139 Ill. App. 3d at 891. Specific performance cannot be demanded as a matter of right; rather, the remedy rests in the sound discretion of

the trial court, based on all the facts and circumstances in evidence. *Rothner v. Mermelstein*, 219 Ill. App. 3d 502, 507 (1991). The evidence necessary to support a decree for specific performance must be clear, explicit, and convincing. *Rench*, 139 Ill. App. 3d at 891.

■ In the case at bar, the trial court specifically found that the Agreement was valid and enforceable, though it ceased to be so following the decedent's death; that the plaintiff had complied with or was ready, willing, and able to comply with the terms of the contract "as far as the depositing of the money with the State Bank of Geneva"; and that the defendant had failed to perform his obligation under the contract by transferring the shares as required by the Agreement. On cross-appeal, the defendant challenges only the trial court's finding as to the plaintiff's compliance with the terms of the Agreement. Specifically, he contends that the plaintiff's failure to timely serve written notice of her intent to exercise the purchase option after receiving notice of the terms of the decedent's will, coupled with her failure to deposit any money in an escrow account at a bank or trust company in Chicago, as required by the Agreement, precludes any award of specific performance in her favor.

In response, the plaintiff argues that, because the August 23 letter made no reference to the Agreement and because it was allegedly not sent via registered or certified mail (a fact disputed by the defendant and belied by the plaintiff's identification of her own signature on a return receipt dated August 24, 1993), it did not constitute notice under section 1 of the Agreement. Citing *Yale Development Co. v. Oak Park Trust & Savings Bank*, 26 Ill. App. 3d 1015 (1975), the plaintiff argues that the defendant cannot take advantage of his own conduct and claim that the failure of the fulfillment of a condition defeats his liability under the Agreement. The plaintiff thus contends, in effect, that her noncompliance with the notice requirements of section 2 of the Agreement was excused by the defendant's alleged failure to comply with section 1.

We disagree. The case cited by the plaintiff stands for the proposition that a party cannot take advantage of his own conduct where he *deliberately prevents* the fulfillment of a condition on which his liability under a contract depends. *Yale Development Co.*, 26 Ill. App. 3d at 1020. This holding dovetails with the general rule that a party seeking specific performance of a contract must show that she has performed her part of the agreement or that she was ready, willing, and able to perform and was prevented from doing so by the act of the other party. *Rothner*, 219 Ill. App. 3d at 507. Yet nothing in the record herein indicates how the defendant's alleged noncompliance prevented the plaintiff from timely giving notice of her intent to purchase the subject shares.

Under section 2 of the Agreement, the plaintiff, as a shareholder choosing to exercise her right and option to purchase, was required to serve written notice "within one month after receipt of the notice given pursuant to Section 1 of [the] Agreement." The record reveals that the plaintiff had actual notice of the terms of the decedent's will before her receipt of the August 23 letter, as she had already obtained a copy of the will. The plaintiff further testified that "not very long" after the decedent's death in June 1993, counterdefendant David had told her that the decedent had left her stock to her children and to her ex-husband, to which the plaintiff responded, "[S]he can't do that, that's not according to the contract." Although the defendant made no express reference to the Agreement in the August 23 letter, his inclusion of a copy of the will was sufficient to apprise the plaintiff of the bequest. Even after her receipt of the August 23 letter, however, the plaintiff waited almost $3^{1}/_{2}$ months before giving notice on December 10, 1993, of her intent to exercise her option to buy the shares. The plaintiff has thus failed to establish that she performed her obligations under the Agreement or that the defendant prevented her from doing so. Accordingly, we conclude that the plaintiff was not entitled to specific performance of the Agreement. See *Rothner*, 219 Ill. App. 3d at 507.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed. The stay of enforcement, granted by this court on September 21, 1995, shall be vacated upon the issuance of the mandate herein.

Affirmed.

INGLIS and COLWELL, JJ., concur.