No. 2--03--0878              

_____________ _________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

WILLIAM RADKIEWICZ, ) Appeal from the Circuit Court 

) of Du Page County.

Plaintiff and Counterdefendant, )

)

v. ) No. 01--CH--1372

)

EDWARD F. RADKIEWICZ; ROBERT )

J. RADKIEWICZ, Indiv. and as Assignee of )

Lease by Berco Floral Company, Lessee; )

FIFTH THIRD BANK, as Successor to Old )

Kent Bank, as Successor to Pinnacle Bank, as )

Successor to Suburban Trust and Savings           )

Bank, not Indiv. but as Trustee under Trust        )

Agreement dated November 19, 1973, and )

Known as Trust No. 2615,     )

)

Defendants and Counterplaintiffs and )

Third-Party Plaintiffs-Appellees )

)

(Olympia Investments, Defendant and ) Honorable 

Counterdefendant-Appellant; Colliers, Bennett ) Edward R. Duncan, Jr.,

and Kahnweiler, Third-Party Defendant). ) Judge, Presiding.

______________________________________________________________________________

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court: 

Olympia Investments (Olympia) appeals from the judgment of the circuit court finding that Olympia breached its real estate contract with Edward F. Radkiewicz and Robert J. Radkiewicz (the Radkiewiczes) and awarding the Radkiewiczes the earnest money that Olympia had put down on the contract.  We reverse. 

The following facts are taken from the bench trial on the Radkiewiczes' claim.   The Radkiewiczes, together with their brother William, were beneficiaries of a trust established by their parents.  The primary asset of the trust was a 27-acre tract of land (the Berco property), in unincorporated Du Page County.  In June 2001, having represented to Olympia that they had the authority to bind the trust without William's consent, the Radkiewiczes entered into a contract with Olympia for the sale of the land.  Pursuant to the contract, Olympia deposited in escrow $25,000 in earnest money.  The contract specified September 1, 2001, as the "Final Contingency Date."  Section R--4(a) of the contract provided: 

"The closing hereunder *** shall take place within fifteen (15) days of either a) the last applicable Final Contingency Date or b)  March 1, 2002 if elected by PURCHASER *** to extend the Closing Date, as extended if extended or on such earlier date as shall be mutually agreeable to the parties."

In August 2001, Olympia obtained a 90-day extension of all applicable dates under the contract by depositing an additional $30,000 earnest money in escrow.  

In October 2001, William filed suit against the Radkiewiczes and Olympia, challenging the legal ability of the Radkiewiczes to execute a sale without William's endorsement.  William also filed a 
lis pendens
 on the Berco property.  In November 2001, Olympia procured a second 90-day extension from the Radkiewiczes with a nonrefundable payment of $8,500.  The amendment memorializing the extension cited "economic and market uncertainties" as the reason for the extension.  

The 
lis pendens
 was not lifted before the time for closing specified in the contract expired.  (In fact, it appears that the 
lis pendens
 was still in existence at the time of trial.)  Closing on the sale never occurred.  On March 11, 2002, the Radkiewiczes sent Olympia the following notice of default: 

"Pursuant to the terms of the *** contract, Olympia was either to be prepared to 

close the transaction on March 1, 2002, or to exercise the option of extending the closing date  by tendering the option fee and placing additional earnest money in escrow.  Neither of the foregoing has been done by Olympia. 

Seller hereby gives notice that Olympia is in default of the contract and the contract

has thereby terminated through no fault of Seller who is ready, willing and able to close the transaction."

When Olympia refused to release the earnest money in escrow, the Radkiewiczes filed a claim against Olympia for breach of contract, claiming right to the $55,000 in earnest money.      

There was conflicting testimony at trial as to who was responsible for the failure to close.  Each party's witnesses generally accused the other party of not initiating the closing process and not being prepared to close in any event.  Michael Mills, who was employed by Olympia to locate investment properties, testified that the 
lis pendens
 was of concern to Olympia because it was a cloud on title and diminished the likelihood of securing an end user for the Berco property.  Mills testified that he expressed his concerns about the 
lis pendens
 to the Radkiewiczes and was assured by them that they would "take care" of the problem.  As the March 1, 2002, deadline for closing approached, Mills reiterated his concerns but never received any indication that the problem of the 
lis pendens
 had been resolved by the Radkiewiczes.  Mills testified that Olympia did not ultimately close on the property because the 
lis pendens
 was not removed and hence a cloud on title remained.  Mills testified that Olympia would have closed on the property had the Radkiewiczes been able to produce clear title.  Mills admitted that he did not recall ordering a title commitment on the Berco property as required of Olympia under the contract.  

David Barr, Olympia's attorney on the contract, testified that he informed Duane Slayton, the attorney for the Radkiewiczes, that Olympia would not close unless the 
lis pendens
 was removed.  According to Barr, Slayton responded that he and the Radkiewiczes would attempt to have the 
lis pendens
 removed.  The following exchange occurred when Barr was asked why Olympia did not close on the sale: 

"Q.  Were you ever given a closing date by Mr. Slayton? 

A.  No.

Q.  Did he ever supply you with any closing documents?

A.  No.  

Q.  Did he ever notify you of a closing date? 

A.  No.

Q.  Did Mr. Slayton ever indicate to you in writing or verbally that the 
lis pendens

had  been taken care of? 

A.  No.  

Q.  Or that the litigation was terminated?  

A.  No."

Barr testified that he advised Olympia not to close on the property because of the 
lis pendens
.  Barr admitted that Olympia never expressed in writing that the 
lis pendens
 was an obstacle to closing. 

Michael Rose, a principal of Olympia, also testified that Olympia did not close on the property because of the 
lis pendens
.  Rose testified that Olympia was prepared to close on the contract on March 1, 2002.  Rose testified that, although he had a loan commitment from a bank on March 1, 2002, the commitment was not in writing.     

Duane Slayton acknowledged that the 
lis pendens
 had to be "taken care of at or prior to closing."  Slayton testified that after William filed suit, Slayton spoke to Richard Bales of Chicago Title Insurance about the possibility of insuring over or waiving the 
lis pendens
.  Bales informed Slayton that "when [Olympia] was ready to close, [Bales] would very seriously attempt to seek a way" to deal with the 
lis pendens
.  Because no closing date had yet been scheduled, Bales said he "was not going to commit" to dealing with the 
lis pendens
.   Slayton further testified as follows:  

"Q.  So what did you do in preparation for the March 1
st tentative closing date to

eradicate, expunge or otherwise release the 
lis pendens
? 

A.  I had discussions with Mr. Bales and did other things getting ready to get it

waived in the event there was a closing.

* * *

Q.  So would it be fair to say it's true you didn't know if Chicago Title or any

other title company would waive or insure over the 
lis pendens
 by the March 1st closing date?   A.  I had very good indications all around that it could and would be done. 

* * *

Q.  When you issued the default letter in March of 2002-- 

A.  The what letter?

Q.  The default letter.

A.  Okay.

Q.  Did you have clear title?

A.  We were getting ready to close.

Q.  The question is, did you have clear title, sir? 

A.  We would have had clear title when they're ready to close.

* * *  

Q.  And that's through Mr. Bales with Chicago Title?  

A.  Be it through Mr. Bales or other means.

* * *

Q.  Mr. Slayton, did you schedule a closing for this real estate transaction prior

to your issuance of a notice of default in March, 2002? 

A.  The buyer did not schedule a closing.

Q.  Did you schedule a closing, sir?  Did you schedule a closing?

* * *

A.  I--I tentatively inquired about scheduling a closing with the title company, but

I had not heard from the buyer so I didn't schedule one.  

THE COURT:  So you did not schedule a closing?  

THE WITNESS:  I did not schedule--                      

THE COURT: Thank you.

THE WITNESS:  --a closing.

MR. DWYER [Olympia's attorney]:  Mr. Slayton, what is the reason that you did not

schedule a formal closing with Mr. Mills?

* * *

A.  The date of closing, March 1st, had come and gone and there was no action

by the buyer to schedule it.  And therefore, I didn't schedule one but I was ready for one."

Robert Radkiewicz testified that, at a meeting in January or February 2002, Mills stated that "it didn't look like [closing] was going to take place" on March 1, 2002, because "the economy wasn't proper *** and they were having problems finding [end users]."  Robert testified that Olympia did not "appear on the 28th of February or 1st of March ready, willing and able to close the transaction."   Edward Rakiewicz testified as follows:  

"Q.  *** [D]id Mr. Mills actually perform the contract by appearing at the closing

on the 28th of February or the 1st of March--                    

A.  No.

Q.  --to close this transaction?  Did he ever give you a reason as to why the closing

did not go ahead?

A.  He said it just wasn't--they couldn't perform, and it just wasn't opportune at

that time.      

* * *

Q.  As far as your understanding goes, did you have all the necessary documents

in order to close the property for March 1st of 2002?

A.  We were in the process of gaining all of them, yes.  

Q.  Well, you either had them, sir[,] or you didn't.

A.  Well, I if--I guess if a closing was imminent, we would have had them.  

Q.  But did you have them as of March 1st of 2002? 

A.  There was no closing.  There was no closing scheduled." 

The trial court found that Olympia defaulted on the contract.   First, the trial court found that Olympia's answer to the Radkiewiczes' complaint did not specify how the Radkiewiczes failed to comply with all conditions precedent in the real estate contract.  Citing Supreme Court Rule 133(c)  (134 Ill. 2d. R. 133(c)), the trial court concluded that Olympia conceded that the Radkiewiczes complied with all conditions precedent under the contract.  The trial court further found that Olympia "failed to meet its obligation of being prepared to close at the time designated in the contract."  Specifically, the trial court noted that Olympia did not order a title commitment as required by the contract and, assuming that Olympia considered the 
lis pendens
 an impediment to closing, did not so notify the Radkiewiczes and afford them a chance to cure.  Olympia filed this timely appeal.  

The relevant facts here are not in dispute.  Rather, this case hinges on the interpretation of the parties' real estate contract.  Interpretation of contract language is a question of law, which we review 
de novo
.  
In re Shaffer
, 319 Ill. App. 3d 1048, 1051 (2001).

Olympia challenges the trial court's finding that Olympia breached the real estate contract.  Olympia concedes that it did not order a title commitment as required by the contract but insists that  its lack of compliance was excused by the Radkiewiczes' admitted failure to obtain clear title.  Olympia submits that ordering a title commitment would have been futile when it was apparent to  both Olympia and the Radkiewiczes that clear title could not be conveyed as required by the contract. The Radkiewiczes reply that Olympia was presumptuous in believing that the 
lis pendens
 would still be in existence at the time of closing: 

"Illinois law is clear that a purchaser cannot assume that because a title objection appears two months before a closing that it's going to exist on the date of closing.  Olympia did not schedule or appear at a closing to say it was ready, willing and able to accept the property, There was no lender, there was no title, there were no tenants, there were no end users.  Olympia never ordered the title, never indicated to seller that there was an impediment, never appeared at a closing asking for releases and had no construction plans for the property."  

Olympia rejoins: "[The Radkiewiczes] did nothing to effectuate a closing.  [The Radkiewiczes] did not schedule a closing date, order closing documents or anything of a like nature."

In our view, Olympia never breached the real estate contract because the Radkiewiczes never tendered their performance.  The contract between the parties contemplated that the balance of the purchase price and the deed of sale would be exchanged at closing.   

"Where the contract requires the buyer to pay money and the seller to deliver the object of the sale at a certain time, those covenants are mutual and dependent.  Under such circumstances, neither party can compel the other to perform without first tendering the money or the item."  
Rothner v. Mermelstein
, 219 Ill. App. 3d 502, 507 (1991).  

See also 
Johnson v. Hermanson
, 221 Ill. App. 3d 582, 584 (1991).  The tender required is an expression of readiness, willingness, and ability to perform.  
Dunham v. Dangeles
, 67 Ill. App. 3d 252, 256 (1978).  Section R--4 of the contract addresses the time of closing and provides: 

"(a)  The closing hereunder shall be through the escrow referred to in R--4(b) below

and shall take place within fifteen (15) days of either a) the last applicable Final Contingency Date or b) March 1, 2002 if elected by PURCHASER per Section R--2(b) to extend the Closing Date, as extended if extended or on such earlier date as shall be mutually agreeable to the parties.

(b)  Not later than five (5) days prior to Closing, the parties shall establish the

usual form of deed and money escrow with Chicago Title & Trust Company,  at which time the earnest money and any interest thereon shall be deposited therein.  Counsel for the respective parties are hereby authorized to execute the escrow trust instructions, as well as any amendments thereto."

The final contingency date specified in the original real estate contract was September 1, 2001.  The two amendments, each an extension of 90 days, moved the final contingency date to March 1, 2002.  Thus, under  section R--4(a), closing was to occur within 15 days of March 1, 2002, or earlier as agreed by the parties.  The contract does not indicate which party was responsible for taking the initiative in scheduling a closing date within the required period.      

Although there was conflicting testimony at trial as to whether a closing date was scheduled, the Radkiewiczes and Olympia conceded at oral argument that no such date was ever scheduled.  
It is clear to us that the Radkiewiczes failed to prove that they were ready, willing, and able to perform on this contract at any time during the closing period specified by the contract.  Edward, who faulted Olympia for not appearing on February 28 or March 1, 2002, to close the transaction, admitted that he and his brother did not possess all of the required closing documents on those dates.  Then, curiously, Edward explained that he had not yet gathered all of the documents on those dates because no closing date had been scheduled.  Slayton admitted that the Radkiewiczes did not have clear title on March 11, 2002, when the default letter was issued, but emphasized that he would have had clear title by the time of closing.  Slayton blamed Olympia for not scheduling the closing, but we see no indication in the contract that it was Olympia's duty to take the initiative in scheduling the closing.  Rather, this appears to be a case where each party expected the other to initiate, yet neither had the right to so expect.                       

We recognize that the Radkiewiczes sent a letter to Olympia on March 11, 2002 (within the required closing period), proclaiming themselves ready, willing, and able to perform.  However, that  letter was a notice of termination, not a tender.  Therefore, as we view the record, the Radkiewiczes have identified no date on which they conveyed or could have conveyed that they were ready, willing, and able to furnish unencumbered title as required by the contract.  Absent proof of tender by the Radkiewiczes, we cannot say that Olympia defaulted on the contract.  In fact, the Radkiewiczes terminated the contract on March 11, 2002--four days before the time for closing expired.

Given the foregoing, the flaw in the trial court's reasoning is obvious.  The trial court found Olympia in breach because it "failed to meet its obligation of being prepared to close at the time designated in the contract."  Although neither Olympia nor the Radkiewiczes were at any time prepared to close on the contract, the trial court laid the blame on Olympia.  As the above authorities indicate, only a tender of performance by the Radkiewiczes could have placed Olympia in default, and the trial court identified no evidence that the Radkiewiczes either tendered or could have tendered their performance before they terminated the contract via the March 11, 2002, letter.

We disagree with the trial court that, by operation of Rule 133(c), Olympia waived the Radkiewiczes' performance of conditions precedent under the contract.  Rule 133(c) provides:

"In pleading the performance of a condition precedent in a contract, it is sufficient to allege generally that the party performed all the conditions on his part; if the allegation be denied, the facts must be alleged in connection with the denial showing wherein there was a failure to perform."  134 Ill. 2d R. 133(c).

Thus, under Rule 133(c), "[a] general denial to an allegation of the performance of a condition precedent is treated as an admission of performance."  
Wilbur v. Potpora
, 123 Ill. App. 3d 166, 171 (1984).  The Radkiewiczes argue that Olympia was not specific in its denials and therefore conceded the Radkiewiczes' performance of all conditions precedent.  Olympia responds that its affirmative defense of impossibility contained a specific denial that the Radkiewiczes had clear title as required by the contract and that this denial was supported by a reference to the 
lis pendens
.  We agree with Olympia that the specific denial required by Rule 133(c) may be contained in an affirmative defense.  There is no suggestion in Rule 133(c) that the denial it contemplates must be contained in a particular part of a party's responsive pleading.  

Notably, in rendering its verdict for the Radkiewiczes, the trial court reasoned that the presence of the 
lis pendens
 did not nullify Olympia's obligation under the contract to order the title commitment and plat of survey.  Accordingly, the trial court "denied" Olympia's affirmative defense of impossibility and announced that it would then "go to the pleadings" to determine the applicability of Rule 133(c).  However, the affirmative defense 
was
 part of the pleadings.  Moreover, the ultimate validity of an affirmative defense does not affect whether the denial it contains satisfies Rule 133(c)'s  specificity requirement.  Rule 133(c) is concerned with the pleadings themselves, not with the proof in support of them.      

The Radkiewiczes state, emphatically but conclusorily, that impossibility is not a recognized affirmative defense in Illinois.  For support they cite, without explanation, section 2--613(d) of the Code of Civil Procedure (735 ILCS 5/2--613(d) (West 2002)), which provides:

"The facts constituting 
any affirmative defense
, such as payment, release, satisfaction, discharge, license, fraud, duress, estoppel, laches, statute of frauds, illegality, that the negligence of a complaining party contributed in whole or in part to the injury of which he complains, that an instrument or transaction is either void or voidable in point of law, or cannot be recovered upon by reason of any statute or by reason of nondelivery, want or failure of consideration in whole or in part, 
and any defense which by other affirmative matter seeks to avoid the legal effect of or defeat the cause of action
 set forth in the complaint, counterclaim, or third-party complaint, in whole or in part, and any ground or defense, whether affirmative or not, which, if not expressly stated in the pleading, would be likely to take the opposite party by surprise, must be plainly set forth in the answer or reply."  (Emphasis added.) 

Presumably, the Radkiewiczes believe that impossibility is not an affirmative defense because it is not specifically enumerated in the provision.  However, the emphasized language of the statute clearly indicates that the list is not meant to be exhaustive.  The affirmative defense of impossibility is well established in the common law of Illinois.  See, 
e.g.
,  
Illinois-American Water Co. v. City of Peoria
, 332 Ill. App. 3d 1098, 1106 (2002).  

As for the fate of the $55,000 in earnest money, the contract provides:

"If this contract is terminated without Purchaser's fault, the earnest money shall be returned to the Purchaser, but if the termination is caused by the Purchaser's fault, then upon notice to the Purchaser, the earnest money (plus interest thereon), shall be forfeited to the Seller ***."

Here, the contract was terminated by the Radkiewiczes via the March 11, 2002, letter.  This occurred prior to the Radkiewiczes' tendering their performance and the expiration of the time designated in the contract for closing.  Therefore, the earnest money shall be returned to Olympia.

For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County.   Reversed.    

BOWMAN and CALLUM, JJ., concur.